**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,   ) | |
| ) | |
| ) | |
| v.                                             ) | |
| )  CR419-149 | |
| ) | |
| BARRY WRIGHT,                     ) | |
| ) | |
| Defendant.         ) | |

## ORDER AND REPORT AND RECOMMENDATION

Defendant Barry Wright was originally indicted on one count of possession of an unregistered destructive device, in violation of 26 U.S.C. § 5861(d), and one count of use of fire or explosive to commit a felony, in violation of 18 U.S.C. § 844(h).  Doc. 2 (Indictment).  A superseding indictment added charges of use of a weapon of mass destruction in the United States, in violation of 18 U.S.C. § 2332a, and use of a destructive device during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c).  Doc. 175.  Currently before the Court are Wright's six pending suppression motions, docs. 27, 29, 30, 32, 33 & 34, his "Motion for Discovery", doc. 13, and his "Brady Motion", doc. 99.

1

## BACKGROUND

The Court's prior Report and Recommendation ("R&R") provided a brief summary of the relevant facts contained in several affidavits supporting search warrants in this case:

> Wright's ex-wife suffered severe injuries when the vehicle she was driving "suddenly exploded." Doc. 31-2 at 4.[ ] Investigators later found an incendiary device under the driver's seat. *Id.* It consisted of multiple circuit boards, switches, wires batteries, plastic bottles, accelerant, and cardboard cylinders which tested positive for chemicals commonly found in boat flares. *Id.*
>
> The affidavits state that Wright was an electrical engineer employed by an electrical equipment supplier specializing in switchgear, transformer, and engineering services. Doc. 31-2 at 5. The ex-wife's coworkers also told investigators that Wright was a "boat mechanic/repairman." *Id.* Her attorney indicated that the couple had a tumultuous divorce in which she was awarded a significant amount of money and the couple's home. *Id.* at 4. One of her co-workers noted that she had expressed concern that Wright was "involved" with a recent gas leak in her home. *Id.*

Doc. 100 at 2-3 (footnote omitted). Wright was arrested on state charges in connection with the explosion on July 10, 2019. Doc. 124-1 at 2. He was transferred to federal custody on August 28, 2019. 4:19-mj-00062, doc. 59 (Initial Appearance).

Wright filed nine suppression motions, docs. 27, 28, 29, 30, 31, 32, 33, 34 & 81, and the Government opposed all nine. Doc. 46

(Government's omnibus response to docs. 27, 28, 29, 30, 31, 32, 33 & 34); doc. 84 (Government's response to doc. 81). Several of the motions, docs. 28, 31 & 81, have already been denied. *See* doc. 111 at 9 (denying docs. 31 & 81); doc. 157 at 9 (denying doc. 28). The Court held a February 16, 2023 hearing regarding the six pending motions, docs. 27, 29, 30, 32, 33 & 34. Doc. 188 (Minute Entry). Wright filed three supplementary briefs before the hearing, doc. 182 (supplementing doc. 29); doc. 183 (supplementing doc. 27); doc. 184 (supplementing doc. 30), and two supplementary briefs after the hearing, doc. 190 (supplementing doc. 32); doc. 191 (supplementing doc. 34). The Government responded to both of Wright's post-hearing supplementary briefs. Doc. 193 (responding to doc. 191), doc. 194 (responding to doc. 190). Wright filed replies to the post-hearing responses. Doc. 196 (replying to doc. 193); doc. 197 (replying to doc. 194).

Also before the Court are Wright's "Motion for Discovery", doc. 13, and "*Brady* Motion", doc. 99, which the Court took under advisement after the February 16, 2023 hearing. Doc. 188 (Minute Entry); *see also* doc. 192 at 2 (extending the "under advisement" date). The Government responded to both motions. Doc. 42 (responding to doc. 13); doc. 101

(responding to doc. 99).  Those two motions, docs. 13 & 99, and Wright's six pending suppression motions, docs. 27, 29, 30, 32, 33 & 34, are ripe for disposition.

## ANALYSIS

## I.   The Court will consider Wright's supplemental briefing.

After Wright submitted post-hearing supplemental briefs, the Court noted that "[his] supplemental submissions were neither ordered nor authorized by the Court," and recognized the Government's ability to assert that the supplemental arguments are waived, untimely, or otherwise improper.  Doc. 192 at 1-2 n.1.  The Government argues that the Court should not consider Wright's post-hearing briefs.  *See* doc. 193 at 1-2, doc. 194 at 1-2.  While the Court does not positively conclude that the supplemental briefing was proper, it has considered the arguments presented in that briefing below.[1]  The supplemental briefing does not

---

[1] Wright cites this Court's "unlimited reply brief policy" in support of the timeliness of his submissions.  *See, e.g.*, doc. 196 at 1; *see also, e.g., Luke v. University Hospital Servs., Inc.*, 2019 WL 4670757, at *1 n.1 (S.D. Ga. Sept. 24, 2019) (Hall, C.J.).  He contends that the arguments in the supplemental briefing were raised, albeit implicitly, in the original motion.  *See* doc. 196 at 1-2.  While the Court cannot commend the practice of expanding arguments only after a hearing, the Government has had an opportunity to respond to the merits of those arguments.  *See, e.g.,* docs. 193 & 194.

alter the Court's determination, discussed below, that all of Wright's pending suppression motions should be denied.

## II. Wright's arguments based on the invalidity of the warrant challenged in his motion at docket entry 28 fail.

Wright's earlier suppression motion sought the exclusion of all evidence obtained pursuant to a warrant issued on July 3, 2019 for the search of Wright's residence at 205 East 66th Street in Savannah (the "First 66th Street Warrant"). Doc. 28 at 1-2. The Court has denied that motion. Doc. 157 at 9. In at least five of the pending suppression motions, Wright attacks the validity of various warrants because their supporting affidavits are based on information obtained pursuant to the execution of the First 66th Street Warrant.[2] Since Wright's motion has been denied, these "fruit-of-the-poisonous-tree" arguments fail.[3] The

---

[2] *See, e.g.*, doc. 27 at 4-5; doc. 29 at 4-5; doc. 30 at 3-4; doc. 32 at 5-6; doc. 33 at 5.

[3] The Court based its denial of the suppression motion at docket entry 28 on the "good faith exception" articulated by the Supreme Court in *United States v. Leon*, 468 U.S. 897 (1984). *See* doc. 157 at 7-8. Although neither party raises the issue in their briefing, the Court has identified authority indicating that when evidence obtained pursuant to a warrant is saved from suppression under the good faith exception, and when the "saved" evidence is used to support subsequent warrant applications, courts consider the "saved" evidence in evaluating the sufficiency of the subsequent warrant applications in the suppression motion context. *See, e.g.*, *United States v. Ralston*, 2022 WL 1303089, at *13 (N.D. Iowa May 2, 2022) (finding that (1) a warrant application did not provide the issuing magistrate a substantial basis for finding probable cause, (2) that the good faith exception saves the evidence obtained pursuant to the warrant from suppression, and (3) that two subsequently-issued warrants were

discussions below address Wright's arguments which are not premised on the invalidity of the First 66th Street Warrant.

### III.   <u>Wright's pending suppression motions should be denied.</u>

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.  The judicially-created remedy known as the "exclusionary rule" acts as a deterrent to violating the Fourth Amendment by preventing the use of evidence seized as a result of an illegal search.  *United States v. Martin*, 297 F.3d 1308, 1312 (11th Cir. 2002).

In considering whether the affiant's proffer and issuing judge's[4] acceptance of the existence of "probable cause" for the authorizations are adequate, it is important to remember that the standard for review is "exceedingly deferential."  *See United States v. Rangel*, 2018 WL 817845,

---

supported by sufficient probable cause because their applications were based on "fruits of the first warrant [that] were spared by the *Leon* good faith exception[.]").

[4]  While some of the warrants challenged by Wright were issued by a Chatham County, Georgia Superior Court judge, others were issued by the undersigned.  For purposes of this R&R, the judicial officer issuing any warrant at issue will be discussed in the third person.

at *6 (S.D. Ga. Jan. 18, 2018). The Supreme Court has established that, in evaluating the sufficiency of an issuing magistrate's determination of probable cause, "the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983) (quotations, alterations, and citations omitted). "A reviewing court's task is not to make a *de novo* finding of probable cause but rather to decide whether the issuing magistrate—whose assessment of the affidavit's factual presentation is entitled to 'great deference'—had a 'substantial basis' for finding probable cause." *Rangel*, 2018 WL 817845, at *6 (quoting *Gates*, 462 U.S. at 236, 238-39); *see also Leon*, 468 U.S. at 914 ("Reasonable minds frequently may differ on the question of whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according 'great deference' to a magistrate's determination." (citations omitted)). In even " 'doubtful or marginal cases,' " the probable cause determination should be upheld. *Rangel*, 2018 WL 817845, at *6 (quoting *United States v. Scott*, 555 F.2d 522, 527 (5th Cir. 1977)). Probable cause, itself, requires neither convincing proof nor *prima facie* showing of criminality;

only a "substantial chance" of such activity is required.  *See Gates*, 462 U.S. at 243 n.13; *see also, e.g., Willis v. United States*, 2009 WL 1765771, at *7 n. 13 (S.D. Ga. June 22, 2009) (citing *Gates*, 462 U.S. at 235) ("While the probable cause standard has never been precisely quantified, it is settled that it requires neither convincing proof nor even a prima facie showing of criminal activity.").  "The burden of establishing that . . . warrants . . . were defective is upon the defendant."  *United States v. Bushay*, 859 F. Supp. 2d 1335, 1377 (N.D. Ga. 2012) (citing *United States v. Van Horn*, 789 F.2d 1492, 1500 (11th Cir. 1986)).

Even if a substantial basis for the issuing magistrate's probable-cause finding exists, a warrant that fails to sufficiently particularize the place or things to be seized is unconstitutionally overbroad and the resulting general search is unconstitutional.  *United States v. Travers*, 233 F.3d 1327, 1329 (11th Cir. 2000); *United States v. Mitchell*, 503 F. App'x 751, 754 (11th Cir. 2013).  A description is sufficiently particular when it enables the searcher to reasonably ascertain and identify the things to be seized.  *United States v. Bradley*, 644 F.3d 1213, 1259 (11th Cir. 2011).  The Eleventh Circuit instructs that the particularity requirement "be applied with a practical margin of flexibility, depending

on the type of property to be seized, and that a description of property will be acceptable if it is as specific as the circumstances and nature of activity under investigation permit." *United States v. Wuagneux*, 683 F.2d 1343, 1349 (11th Cir. 1982) (citations omitted).

Even if a reviewing court finds that the issuing magistrate did not have a substantial basis for finding probable cause or that the warrant does not satisfy the particularity requirement, the Supreme Court instructs that the evidence obtained pursuant to the warrant should not be excluded if officers reasonably relied on the warrant. *Leon*, 468 U.S. at 921-22; *see also United States v. Taxacher*, 902 F.2d 867, 871 (11th Cir. 1990) ("[S]earches conducted pursuant to warrants will rarely require suppression[.]"). "The good-faith exception applies in all but four sets of circumstances." *United States v. Lara*, 588 F. App'x 935, 938 (11th Cir. 2014) (citing *Leon*, 468 U.S. at 923). It does not apply when: "(1) the magistrate judge was misled by information the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) the magistrate judge wholly abandoned his judicial role; (3) the affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where, depending

9

upon the circumstances of the particular case, a warrant is so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized–that the executing officers cannot reasonably presume it to be valid." *United States v. Hill*, 2014 WL 5410214, at *7 (S.D. Ga. Oct. 23, 2014) (citing *United States v. Robinson*, 336 F.3d 1293, 1296 (11th Cir. 2003)).

Finally, "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring v. United States*, 555 U.S. 135, 144 (2009). "When the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the benefits of exclusion outweigh the costs. [Cit.] But when the police reasonably act with a good-faith belief that their conduct is lawful, or when their conduct involves mere negligence, the deterrent value of suppression is diminished." *United States v. Brito-Arroyo*, 2021 WL 3661200, at *4 (11th Cir. Aug. 18, 2021) (citations omitted).

A. *Wright's suppression motion at doc. 27 should be denied.*

Wright moves to suppress evidence obtained pursuant to a warrant

authorizing the search of a Ford F-150 located at the address of Wright's former employer EEU, Inc. (the "F-150 Motion").  Doc. 27; *see also* doc. 183 (supplementary brief); doc. 27-2 at 2, 5 (supporting affidavit identifying EEU as Wright's employer).  The affidavit explains that law enforcement identified a phone number associated with a SIM card used in the incendiary device.  Doc. 27-2 at 6.  Investigators subsequently obtained surveillance video from a Walgreens store showing a white male wearing a tan hat, dust mask, light blue shirt with white stripes, black pants, and running shoes activating the phone number and paying in cash.  *Id.*  During the execution of the First 66th Street Warrant, law enforcement identified a tan hat "matching the description" of the hat in the Walgreens footage under the backseat of a white F-150 on the premises of Wright's residence.   *Id.* at 7 (the affidavit includes a photograph of the hat under the seat).[5]  The affidavit asserts that the F-150 had been moved from the residence to EEU after the initial search of the residence.   *Id.* at 2, 7; *see also* doc. 188 (at the hearing, Wright reiterated that the F-150 had been moved after the initial search).

---

[5]  The affidavit notes that the F-150 is registered to Wright's employer.  *See* doc. 27-2 at 2, 7.  Wright explains in his motion that the employer provided the truck for his business and personal use.  Doc. 27 at 2.

Wright argued in his initial suppression motion that the affidavit supporting the warrant is insufficient because it relied on information obtained pursuant to the purportedly deficient First 66th St. Warrant. *See* doc. 27 at 4-7. As discussed above, that argument fails. In Wright's supplementary brief, however, he argues that the affidavit does not supply "the constitutionally required nexus between the premises to be searched (the truck) and the things to be seized[.]" Doc. 183 at 1-2. Wright premises this argument on the lack of information in the affidavit regarding the F-150's use after the date of the initial search of the 66th Street address:

> The affidavit . . . provides no information as to any use of the truck by [Wright] or anyone else after [the date of the initial 66th Street search], and none regarding any connection after that date of the truck to the alleged criminal offense.

Doc. 183 at 1-2. At the hearing, Wright reiterated that he was incarcerated when law enforcement searched the F-150 at his former employer's address, and there is no information in the affidavit regarding how the F-150 was moved from the 66th Street address. Doc. 188 (Minute Entry).

Although Wright is correct that an affidavit supporting a search warrant "should establish a connection between the defendant and the

[place] to be searched and a link between the [place] and any criminal activity", *Martin*, 297 F.3d at 1314, his terse argument, doc. 183 at 1-2, does not explain why the absence of information regarding the F-150's use after the initial 66th Street search negates the significant connections between Wright, the alleged crime, and the F-150 in the affidavit.[6]  *See* doc. 27-2 at 2-8.  As discussed, the affidavit connects the F-150 to Wright by noting that it was registered to Wright's employer, doc. 27-2 at 2, 7, and that it was parked on the premises of "Wright's home (located at 205 E 66th Street)" during the initial 66th Street search, *id.* at 7.  It also connects the F-150 to Wright and the alleged crime by stating that law enforcement observed a tan hat under the rear seat which matched the description of the hat worn by the individual activating the phone number associated with the incendiary device in the Walgreens footage.  *Id.*

---

[6] Wright does not argue that the affidavit fails to connect *him* to the alleged crime. *See generally* docs. 27 & 183.  Even if he did make that argument, the affidavit contains much of the same information connecting Wright to the crime as the affidavit supporting the First 66th Street Warrant, which the Court has already found to be sufficient.  *See* doc. 100 at 10, *adopted* doc. 111 at 3, 6-7.  *Compare* doc. 28-2 at 5-7 (affidavit supporting First 66th Street Warrant), *with* doc. 27-2 at 4-6 (affidavit supporting F-150 Warrant); *see also* doc. 27-2 at 7 (adding additional connections between Wright and the alleged crime, including an assertion that law enforcement located a blue and white striped shirt in Wright's bedroom closet, which matches the pattern and color shirt worn by the individual in the Walgreens footage).

Wright's discussion of the lack of information regarding the truck's use after the initial search suggests that he contends that the information in the affidavit was "stale." *See, e.g.*, doc. 183 at 1-2. As the Eleventh Circuit has explained:

> To show probable cause, the government's application for a search warrant must be timely, that is it "must reveal facts that make it likely that the items being sought are in that place when the warrant issues." *United States v. Harris*, 20 F.3d 445, 450 (11th Cir. 1994) (quotation marks omitted). "Warrant applications based upon stale information fail to create a probable cause that similar or other improper conduct is continuing." *Id.* To evaluate staleness claims, we look at the unique facts of each case and may consider "the maturity of the information, nature of the suspected crime (discrete crimes or ongoing conspiracy), habits of the accused, character of the items sought, and nature and function of the premises to be searched." *Id.* There is no particular rule or time limit for when information becomes stale." *United States v. Bervaldi*, 226 F.3d 1256, 1265 (11th Cir. 2000).

*United States v. Deering*, 296 F. App'x 894, 897-98 (11th Cir. 2008). Despite suggesting that suppression is appropriate on staleness grounds, Wright's brief assertion that "[t]he affidavit . . . provides no information as to any use of the truck by Defendant or anyone else" after the initial search, doc. 183 at 1, does not address the factors articulated by the *Deering* Court and is not sufficient to carry his burden to demonstrate staleness.

At the hearing, Wright briefly argued that the Court must suppress all evidence obtained pursuant to the F-150 warrant because the affidavit includes "no allegation that the truck was seen" at the Walgreens at the time of the cell phone transaction.  Doc. 188 (Minute Entry).  As the Eleventh Circuit has explained, however, "the nexus between the objects to be seized and the premises searched can be established from the particular circumstances involved and need not rest on direct observation."  *United States v. Tate*, 586 F.3d 936, 943 (11th Cir. 2009) (internal quotes omitted) (quoting *United States v. Jenkins*, 901 F.2d 1075, 1080-81 (11th Cir. 1990)).  Wright has offered no authority suggesting that law enforcement needed to observe the F-150 at the Walgreens at the time of the transaction before obtaining a warrant to search the vehicle, and the Court is unpersuaded by this argument given the previously-discussed connections between Wright, the alleged crime, and the F-150.

Wright also argues that the nexus between the alleged crime and the F-150 is insufficient because the photograph of the tan hat under the backseat, when "objective[ly] view[ed,] . . . does not reveal a hat—much less the hat in the Walgreens surveillance video.  There is no mention of

any analysis of the photo or video, expert or other, comparing the fabric in the photograph with the video images." Doc. 183 at 2. The Fourth Amendment "allows warrants to issue on probable cause, *a standard well short of absolute certainty*." *Los Angeles Cty. v. Rettele*, 550 U.S. 609, 127 (2007) (emphasis added). Accordingly, "[c]ourts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed[.]" *United States v. Miller*, 24 F.3d 1357, 1361 (11th Cir. 1994). Even if the technical analysis Wright advocates might have strengthened the probable-cause basis, the Court is unconvinced that the issuing magistrate's determination lacks a "substantial basis" absent an unspecified "analysis of the photo or video" or fabric comparison. *See United States v. Robinson*, 62 F.3d 1325, 1331 n.9 (11th Cir. 1995) ("[O]pinions and conclusions of an experienced agent regarding a set of facts are properly a factor in the probable cause equation for issuing a search warrant." (quotations and citations omitted)).[7]

---

[7] The Court acknowledges that the black-and-white photograph of the F-150 backseat in the affidavit is blurry, and the circled object in the photograph is not obviously a tan hat. *See* doc. 27-2 at 7. Law enforcement, however, determined that the object resembled the hat in the Walgreens surveillance, and the photograph does not plainly contradict that assertion. Wright has not shown why the issuing magistrate lacked a "substantial basis" for finding probable cause by relying on law enforcement's

In a single sentence, Wright argues that the Court must suppress all evidence obtained pursuant to the F-150 warrant because "[t]he descriptions in the warrant itself of the numerous items to be seized fail to provide the particularity required by the Fourth Amendment[.]"  Doc. 183 at 2.  The Court disagrees.  The F-150 Warrant authorized law enforcement to search for various specific items, including, e.g., tan hats, black pants, blue and white striped shirts, grey running/tennis shoes, dust masks, Dasani water bottles, cardboard cylinders associated with fireworks, and AT&T pre-paid cellular phones.  Doc. 27-1 at 2.  Wright has not carried his burden of establishing that the warrant was defective because he does not address why any of the items' descriptions are insufficiently particular. *See Van Horn*, 789 F.2d 1492, 1500; *see also, e.g.*, *United States v. Anderson*, 2011 WL 4828886, at *3 (E.D. Tenn. Oct. 11, 2011) (warrant describing "stocking mask, Atlanta Braves cap, red hooded pullover, dark shirt, [and] dark colored shoes" is sufficiently particularized).

Even if the issuing magistrate did not have a substantial basis for finding probable cause that evidence of the alleged crimes would be found

---

determination that the hat in the vehicle matched the hat in the Walgreens video.

in the F-150, or if the items described in the warrant were not sufficiently particularized, the Government's argument pursuant to *Leon*, 478 U.S. at 913, prevails.  *See* doc. 46 at 29-30.  On this point, Wright briefly argues that "[t]he warrant itself being facially deficient in its failure to particularize the items to be seized, the officers executing it could not reasonably presume it to be valid and the *Leon* exception to the exclusionary rule does not apply."  Doc. 183 at 2.  Wright, however, does not argue that any law enforcement conduct was "deliberate enough [for the exclusionary rule] to yield meaningful deterrence[.]"  *United States v. Campbell*, 26 F.4th 860, 886-87 (11th Cir. 2022) (quoting *Davis*, 564 U.S. at 240).  *See also* doc. 27 at 5-7 (Wright's *Leon* argument in his initial brief fails because it is based on the invalidity of the First 66th Street Warrant).  Accordingly, because the issuing magistrate had a substantial basis for finding probable cause and the warrant was sufficiently particularized, or because, even if it were defective, *Leon*'s exception precludes suppression, the F-150 Suppression Motion, doc. 27, as supplemented, doc. 183, should be **DENIED**.

   B. *Wright's suppression motion at doc. 29 should be denied.*

   Wright moves to suppress evidence obtained pursuant to a warrant

authorizing a second search of his home on 66th Street in Savannah (the "Second 66th Street Warrant"). Doc. 29 at 1. The warrant authorized law enforcement to search for the same items specified in the F-150 Warrant. *Compare* doc. 27-1 at 2, *with* doc. 29-1 at 2.

Wright's initial motion is wholly premised on the invalidity of the First 66th Street Warrant. *See generally* doc. 29. Wright's supplemental motion, however, argues that the "required nexus between the things to be seized and the place to be searched is fatally absent [from the affidavit]." Doc. 182 at 2-3 (citing *Martin*, 297 F.3d at 1314). He argues:

> The affidavit shows only that the described items of clothing were worn by an unidentified white male and no factual basis was provided to connect that person or his clothing and shoes with the defendant's residence. Neither the unidentified male nor his clothing is alleged in the affidavit to have been associated with the premises to be searched in any way[.]

*Id.* At the hearing, Wright's counsel acknowledged the affidavit's statements that the tan hat in the F-150 "match[ed] the description" of the hat in the Walgreens footage, and that investigators identified a "blue and white striped shirt" in the closet after observing a "light blue shirt with white stripes" in the footage. Doc. 29-2 at 8; doc. 188 (Minute Entry). Counsel argued, however, that these connections are insufficient because, in his opinion, the photographs of the hat and shirt found at the

66th Street address do not resemble the shirt and hat in the Walgreens footage. Doc. 188 (Minute Entry). As discussed above, however, "[c]ourts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed[.]" *Miller*, 24 F.3d at 1361. Wright has not carried his burden of explaining why the affiant's determination that the hat and shirt in the video resembled the hat and shirt found at the 66th Street address was insufficient, and the Court should decline to suppress the evidence obtained pursuant to the second 66th Street Warrant on this basis.

Wright also argues that the warrant's description of the items to be seized is not sufficiently particular. Doc. 182 at 2. His supplemental brief quotes the following item list from the warrant: "any and all black in color pants, any and all blue and white striped shirts, any and all grey in color running/tennis shoes[.]" Doc. 182 at 2 (quoting doc. 29-1 at 2). As with his argument regarding the F-150 warrant, Wright cites no authority suggesting that these descriptions are not sufficiently particular, *see* doc. 182 at 2; and the Court has identified authority suggesting that they are adequate. *See, e.g.*, *Anderson*, 2011 WL

4828886, at *3.   Wright also asserts that the warrant "does not list any contraband or items that would be unlawful in themselves to possess", doc. 182 at 2; however, it is well-established that search warrants may issue for "the fruits or instrumentalities or evidence of criminal activity[.]"  Wayne R. LaFave, 2 Search & Seizure § 4.6(a) (6th ed. 2022). Finally, Wright argues that "[n]o further description of those items is set forth in the warrant itself, and no photographs or other exhibits are incorporated in the warrant."   Doc. 182 at 2; *see also id.* ("The use of a generic term or a general description in a warrant is never acceptable when a more specific description of the things to be seized is available."). Wright, however, cites no authority requiring a warrant to incorporate photographs to validly authorize a search, nor does he identify how the warrant could have used a "more specific description."   *See id.*

Even if the affidavit or the warrant's description of the items to be seized was insufficient, the Court agrees with the Government that suppression would be inappropriate under *Leon*.   *See* doc. 46 at 29-30. Wright does not address *Leon* in his supplemental briefing, *see generally* doc. 182, and his *Leon* argument in his original brief is premised on the invalidity of the First 66th Street Warrant, *see* doc. 29 at 5-6, which, as

discussed, fails.   Further, Wright does not argue that any law enforcement conduct was "deliberate enough to yield meaningful deterrence." *Campbell*, 26 F.4th at 887 (quoting *Davis*, 564 U.S. at 240). *See generally* docs. 29 & 182.  Accordingly, the Second 66th Street Motion, doc. 29, as supplemented, doc. 182, should be **DENIED**.

   C. *Wright's suppression motion at doc. 30 should be denied.*

   Wright moves to suppress evidence obtained pursuant to a third warrant authorizing the search of the 66th Street address (the "Third 66th Street Warrant").  Doc. 30; *see also* doc. 184 (supplemental brief). The affidavit explains that during a search of Wright's residence, law enforcement discovered a

> . . . homemade power system created for bicycle lighting on a bicycle . . . inside Wright's home.  The power system consisted of commercially obtained components, which included a 12-volt power tool battery.  The 12-volt power tool battery was found to be consistent with the two batteries previously discovered being used as components of the incendiary device (discovered beneath [Wright's ex-wife's] front driver's side seat).  The power system and its components are notably attached together and appear to be similar to the wiring system that was previously discovered in the incendiary device.

Doc. 30-2 at 16-17.  A photograph in the affidavit also shows a pair of sunglasses near the bicycle.  *See id.* at 10.  The issuing magistrate

subsequently authorized the seizure of power tool batteries, wiring, wiring connectors, lights, light bulbs, and sunglasses "possessed in violation of" Georgia attempted murder and arson statutes.  Doc. 30-1 at 2.  Wright's initial motion is wholly premised on the invalidity of the First 66th Street Warrant, *see generally* doc. 30, and his argument in that filing fails.

In his supplemental briefing, Wright argues that the affidavit includes "[n]o factual basis" supporting the statement that the battery and wiring system on the bicycle light resemble the batteries and wiring system in the incendiary device.  Doc. 184 at 2.  The affiant, however, detailed his decades of law enforcement experience, including his experience as a lead homicide investigator.  Doc. 30-2 at 13.  He provided a detailed description of the incendiary device recovered from Wright's ex-wife's car, *id.* at 14, and explained that the 12-volt power tool battery in the bicycle light system was "consistent with" the batteries identified in the incendiary device, and that the wiring system "appear[ed] to be similar" *id.* at 16-17.

The issuing magistrate was entitled to "rely on the conclusions of experienced law enforcement officers" in making her probable cause

determination, and Wright's brief argument, *see* doc. 184 at 2, does not call those conclusions into question. *United States v. Upshaw*, 2021 WL 130968, at *2 (M.D. Ala. Jan. 13, 2021) (citing *United States v. Ayers*, 924 F.2d 1468 (9th Cir. 1991)).  Wright also notes that he was incarcerated before the Second 66th Street Motion was executed, and that the affidavit does not state whether the bicycle was located in the residence during the execution of the First 66th Street Warrant.  Doc. 184 at 2 ("The affidavit does not reveal whether the bicycle was located in the residence at the time of the said initial search, or whether Defendant ever had any connection to the bicycle at all.").  While the Court recognizes some *possibility* that the bike could have been moved to the residence by someone between the July 12, 2019 execution of the First 66th Street Warrant and the August 12, 2019 execution of the Third 66th Street Warrant, the Fourth Amendment "allows warrants to issue on probable cause, a standard well short of absolute certainty." *Rettele*, 550 U.S. at 615.  Accordingly, the Court is unpersuaded by Wright's assertion that all evidence obtained pursuant to the Third 66th Street Warrant must be suppressed because the affidavit does not mention whether the bicycle

was at the residence during the execution of the First 66th Street Warrant.[8]

Wright also argues that the warrant does not list the items to be seized with sufficient particularity.  Doc. 184 at 2-3.  Specifically, he contends that the warrant "fails to provide any description of the particular items to be seized", and "fail[s] to specify any distinguishing characteristics or specifications of the items to be seized (such as, for example, size, color, type, brand or markings)[.]"  *Id.*  As discussed, however, the "description of property will be acceptable if it is as specific as the circumstances and nature of activity under investigation permit."  *Wuagneux*, 683 F.2d. at 1349.  Here, all of the items listed in the warrant relate to items observed by investigators at Wright's residence with some connection to the incendiary device.  *See United States v. DSD Shipping, A.S.*, 2015 WL 5164306, at *9 (S.D. Ala. Sept. 2, 2015).  Further, contrary to Wright's assertion, doc. 184 at 2-3, the warrant does list "distinguishing characteristics" of the items (e.g., "power tool batteries"

---

[8] As with Wright's argument regarding the F-150 Warrant, his discussion of the lack of information regarding the bicycle's location during the initial search of the 66th Street address implicates a "staleness" challenge.  *See* doc. 184 at 2.  However, absent any specific discussion regarding the staleness factors articulated by the Eleventh Circuit, *see, e.g.*, *Deering*, 296 F. App'x at 897-98, Wright has not shown that suppression on staleness grounds is warranted.

instead of simply "batteries"). *See* doc. 30-1 at 2. Given the degree of specificity in the warrant, the Court cannot conclude that it authorized "general, exploratory rummaging in [Wright's] belongings," *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971); *see also United States v. Betancourt*, 734 F.2d 750, 754 (11th Cir. 1984) ("[E]laborate specificity is unnecessary.").

Even if the affidavit was not sufficiently particular, the Court agrees with the Government that the *Leon* exception applies. *See* doc. 46 at 29-30. Wright's *Leon* argument in his initial brief fails because it is wholly premised on the invalidity of the First 66th Street Warrant. *See* doc. 30 at 4-6. Wright has not suggested in his supplemental briefing, doc. 184, or at the hearing, doc. 188 (Minute Entry), that any of the four situations identified by the *Leon* Court in which suppression is appropriate apply, *see* 486 U.S. at 923, nor does he suggest that any law enforcement conduct was "deliberate enough to yield meaningful deterrence", *Campbell*, 26 F.4th at 886-87 (quoting *Davis*, 564 U.S. at 240). Wright's motion, doc. 30, as supplemented, doc. 184, should be **DENIED**.

D. *Wright's suppression motion at doc. 32 should be denied.*

Wright moves to suppress evidence obtained pursuant to a warrant authorizing the forensic examination of fifteen electronic devices, including several cell phones, thumb drives, a laptop, and an iPad.  Doc. 32; doc. 32-1 (warrant); *see also* doc. 190 (supplementary brief).  The warrant authorized law enforcement to conduct forensic examinations of the devices for the purpose of identifying specific categories of information related to, *e.g.*, violations of 18 U.S.C. § 844(i) & (h), device user attribution, and internet use.  *See* doc. 32-1 at 7-9.[9]

Before turning to the substance of Wright's motion, the Court must address an argument raised in the Government's response to Wright's post-hearing supplemental brief.  The Government states, without citation to the record or explanation, that "[t]he warrant incorporates the affidavit by reference," and that the Court should consider the content of the affidavit in determining whether the warrant satisfies the Fourth Amendment's particularity requirement.  *See* doc. 194 at 5.  "[The Supreme Court does] not say that the Fourth Amendment prohibits a

---

[9]  In his initial motion, Wright "allege[d] on information and belief that the warrant was not executed on or before the date specified [in the warrant]."  Doc. 32 at 4.  He withdrew this argument at the hearing.  Doc. 188 (Minute Entry).

warrant from cross-referencing other documents." *Groh v. Ramirez*, 540 U.S. 551, 557 (2004).   Accordingly, "[t]he longstanding rule in the Eleventh Circuit is that (1) a warrant may incorporate by reference another document's description of items to be seized; and (2) even if a warrant fails to incorporate by reference, the warrant is still valid so long as the document containing the description is attached to the warrant and accompanies it at the time of execution." *United States v. Morris*, 2017 WL 5180970, at *5 (S.D. Ga. Oct. 19, 2017).[10]

Although the Government states that "[t]he warrant incorporates the affidavit by reference", it does not cite any portion of the record to support that assertion.  *See* doc. 194 at 5.[11]  Upon independent review of the warrant, the Court can only discern a single reference to the affidavit: "I [the issuing magistrate] find that the affidavit(s) . . . establish probable cause to search and seize the person or property described in [Attachment

---

[10]  The Government does not state that the affidavit was attached to the warrant during execution.  *See generally* doc. 194.

[11]  Further, the Government did not file a sur-reply clarifying its "incorporation" assertion after Wright argued that the Court should evaluate the warrant's particularity based only on the face of the warrant.  *See* doc. 197 at 3.

A], and that such search will reveal [the information in Attachment B]."[12]

Doc. 32-1 at 2.   Courts in the Eleventh Circuit have found similar language insufficient to establish incorporation:

> The warrant in this case, however, does not incorporate the affidavit.  The warrant states only that, "[a]ffidavit having been made before me . . . , which establishes probable cause to make the search herein designated," with the house . . . then identified as the place to be searched.  [Cit.]  Such general language does not incorporate by reference the affidavit's description of the premises to be searched. . . . As set forth in *United States v. Curry*, 911 F.2d 72 (8th Cir. 1990)[,] . . . "suitable words of reference incorporating [an] affidavit" are phrases such as "see attached affidavit" or "as described in the affidavit." 911 F.2d at 77 (internal quotes omitted); *accord United States v. Tracey*, 597 F.3d 140, 147–48 (3rd Cir. 2010) (incorporation must be "clear," using phrases such as "see Exhibit A sealed by Order of the Court" or "specified in the annexed affidavit") (internal quotes omitted).  Nothing of the sort is present here.

*United States v. Crabtree*, 2015 WL 631364, at *1 (S.D. Ala. Feb. 13, 2015) (citations omitted).[13]  Although a warrant can incorporate an affidavit by

---

[12]  Although, as discussed below, it appears that the language in the warrant is insufficient to incorporate the affidavit by reference, the Court also notes that the reference is the result of language in the Administrative Office's form "Search and Seizure Warrant," Form AO 93.

[13]  In *Morris*, this Court found that a warrant including similar language to the warrant at issue in this case did not incorporate an affidavit.  *See United States v. Morris*, CR117-039, doc. 19 at 13 (S.D. Ga. Aug. 3, 2017) (The warrant includes general references to the affidavit such as "[a]ffidavit having been made before me", and "[b]ased upon the affidavit[.]"); *Morris*, 2017 WL 5180970, at *5 (Epps, M.J.) ("The problem, however, is that the warrant does not incorporate by reference the affidavit and application[.]").

"specifically referenc[ing] the [affidavit] (even if not expressly incorporating it)", *United States v. Wheat*, 2020 WL 13596203, at *7 (N.D. Ga. May 28, 2020), the Court declines to consider the warrant's list of items as supplemented by the affidavit absent any argument from the Government on this point.

Wright's original motion is premised on the invalidity of the First 66th Street Warrant, *see* doc. 32 at 4-8, and the argument in that motion fails.[14]   The parties did not provide argument on this motion at the hearing.   Doc. 188 (Minute Entry).   After the hearing, Wright filed a supplemental brief arguing that the warrant itself is deficient because it does not describe the items to be seized with sufficient particularity.   *See* doc. 190 at 2-7.   The supplemental brief addresses the warrant's three

---

[14]   The closest Wright comes to raising an argument which does not rely on the invalidity of the First 66th Street Warrant in his original brief is a conclusory assertion that "[t]he affidavit for the search warrant at issue is devoid of any facts that would logically lead to the conclusion that the data located within the said devices would contain evidence of the specified criminal activity." Doc. 32 at 5. The entirety of Wright's argument in the brief, however, relates to the invalidity of the First 66th Street Warrant. *See id.* at 4-8. To the extent the quoted sentence is a distinct argument that does not rely on the invalidity of the First 66th Street Warrant, the Court should decline to take the drastic step of suppressing all evidence obtained pursuant to the warrant based on the unexplained sentence. To the extent the quoted portion suggests that, assuming the evidence obtained pursuant First 66th Street Warrant is excluded, the warrant lacked probable cause, that argument fails.

distinct categories of information separately, *see id.* at 2-8, and the Court will address those challenged categories in turn.

> The first category of information in the warrant is:

> All records on the [fifteen devices] that relate to violations of (1) malicious damage and destruction, by means of fire and explosive materials to a vehicle used in interstate commerce and in an activity affecting interstate commerce, resulting in personal injury, pursuant to [18 U.S.C. § 844(i); and (2) use of fire or an explosive to commit any felony offense, pursuant to [18 U.S.C. § 844(h)], and involve Barry Wright, including [14 specific categories of information].

Doc. 32-1 at 7-8.  Wright acknowledges that the warrant limits the information sought to information related to violations of specific statutes; however, he argues that it "contains no *description* of the specific offenses charged in the indictment."  Doc. 190 at 3 (emphasis added); *see also id.* ("This item requires the officer conducting the search to make his own decisions and exercise his own discretion about which records 'relate to violations[.]' ").

Courts, however, have recognized that "[w]hen [a] warrant[ ] specifically connect[s] the items to be searched for and seized to the specific criminal conduct suspected, it weighs in favor of finding that the warrant[ ] [is] adequately particularized[.]" *United States v. Zhu*, 555 F. Supp. 2d 1375, 1381 (S.D. Ga. 2008) (citations omitted); *see also United*

*States v. Carroll*, 2015 WL 13741254, at *7 (N.D. Ga. Nov. 3, 2015) (finding a warrant to be sufficiently particularized when it "authorized the seizure of items listed in twelve categories that were specifically limited to evidence of violations of [specific statutes.]"). Since "reference to the . . . statute[s] [themselves] without parroting [their] terms is sufficient", *Carroll*, 2015 WL 13741254, at *7 (quoting *United States v. Lamb*, 945 F. Supp. 441, 463 (N.D.N.Y. 1996)), the Court is unpersuaded by Wright's argument that the warrant contains "no description of the specific offenses charged[.]"   Doc. 190 at 3; *see also United States v. Dupree*, 781 F. Supp. 2d 115, 148 (E.D.N.Y. 2011) (particularity satisfied when warrant states the "items to be seized are evidence or instrumentalities of violations of 18 U.S.C. §§ 1341, 1343, 1344, and 1349").

Next, Wright argues that paragraph 1 is not sufficiently particularized because it does not limit the information sought "by date, time period, location, circumstances or anything else."   Doc. 190 at 2-3. Wright cites no authority to support his argument that the warrant is facially invalid based on this purported deficiency.   *See id.*   To the contrary, the seminal Eleventh Circuit case regarding the lack of

temporal limitation in warrants, *United States v. Blake*, 868 F.3d 960 (11th Cir. 2017), merely found it "somewhat troubling" that a warrant served on Microsoft seeking categories of emails related to sex trafficking charges did not limit the emails sought to the time of the alleged conspiracy. *Id.* at 973 n.7; *see also United States v. Addaquay*, 2021 WL 1899355, at *5 (N.D. Ga. Feb. 18, 2021) (referring to *Blake* as the "seminal case" on temporal limitations in warrants and quoting its conclusion that "the mere lack of temporal limitation did not render [the challenged warrants] unreliable at least based on the state of the law."). Wright's conclusory sentence does not explain why the lack of temporal limitation, or the lack of non-descript "location, circumstances or anything else" render the warrant invalid, especially given the warrant's clear limitation that the information must "relate to violations" of the listed statutes. Doc. 32-1 at 7; *Blake*, 868 F.3d at 963 n.7 ("[T]he warrant was appropriately limited in scope because it sought only discrete categories of emails that were connected to the alleged crimes. As a

result, the lack of a time limitation did not render the warrant unconstitutional.").[15]

Nor is the Court persuaded by Wright's brief argument that "the warrant [did not] provide any information as to the meaning of the phrase 'involve Barry Wright.'  No person of that name is described in the warrant as having any role in the offense under investigation.  No information is provided as to the person's gender, age, place of residence, or anything else." Doc. 190 at 3.  "The Fourth Amendment requires only that the search warrant describe the premises in such a way that the searching officer may 'with reasonable effort ascertain and identify the place intended.' " *United States v. Burke*, 784 F.2d 1090, 1092 (11th Cir. 1986) (quoting *United States v. Weinstein*, 762 F.2d 1522, 1532 (11th Cir. 1985)).  Wright does not explain why a warrant describing the specific devices, and information on those devices related to violations of the statute and "involving Barry Wright" are insufficient.  *See* doc. 190 at 3.

---

[15] Even if Wright could show a constitutional violation based on the lack of temporal limitation in the warrant, as discussed below, the *Leon* good-faith exception would apply.  *See Blake*, 868 F.3d at 974 ("[W]e need not decide whether the . . . warrants violated the Fourth Amendment because, even if they did, . . . [they] fall into the 'good-faith exception' to the exclusionary rule[.]").

Next, Wright argues that the 14 specific subparagraphs under paragraph 1 fail to list the information sought with sufficient particularity.  Doc. 190 at 3-6.  Wright challenges subparagraphs a, b, c, d, m, and n, by arguing that the information described in those paragraphs is insufficiently defined, thereby requiring officers to "use [their] own discretion in deciding what to seize."  *Id.* at 5.  The phrases challenged on this basis are:

- a. Any information related to video recordings of [the ex-wife] and Barry Wright.
- b.-c. Any information regarding [the ex-wife's or Barry Wright's] schedule or travel.
- d. Any information regarding a 2013 light green Ford Flex.
- m. Any information related to bank records, checks, credit card bills, account information, insurance, and other financial records.
- n. Any information related to financial beneficiaries.

Doc. 190 at 3-6.  Wright has not shown that categories a, b, c, d, and m lack sufficient specificity.  Although the Court recognizes that these descriptions require *some* exercise of discretion by the executing officers, "[t]he position that a warrant may not grant any discretion to an executing officer has been affirmatively rejected by the Eleventh Circuit." *United States v. Al-Arian*, 2005 WL 8166959, at *10 n.21 (M.D. Fla. Apr. 8, 2005) (citing *Wuagneux*, 683 F.2d at 1349 n.4).  As the Middle District

of Florida explained, "defining all potentially ambiguous terms in a search warrant is not necessary, for officers are entitled to a 'practical margin of flexibility' when drafting search warrants." *Id.* (quoting *Wuagneux*, 683 F.2d at 1349). Accordingly, Wright has not shown that the descriptions listed in subparagraphs a, b, c, d, and m are insufficiently particularized, especially given the warrant's limitation of "records . . . that relate to violations of [the relevant statutes]." Doc. 32-1 at 7.

The Court, however, agrees with Wright that category n, "Any information related to financial beneficiaries", is insufficiently particularized. *See* doc. 190 at 6. The warrant does not specify, e.g., the event from which a "beneficiary" must benefit, or the nature of the "financial" benefit. *See* doc. 32-1 at 8. Despite this deficiency in the warrant, however, suppression is inappropriate under the *Leon* exception, as discussed below.

Wright challenges subparagraphs f, g, h, i, j, k, and l by noting that they all refer to a "fire" not specified in the warrant:

- f. Any information related to the research of items used in the fire on July 2, 2019.
- g. Any information related to the purchase of items used in the fire on July 2, 2019.

36

- h. Any information related to the building or manufacture of the items used in the fire on July 2, 2019.
- i. Any information related to the transportation of the items used in the fire on July 2, 2019.
- j. Any information related to the installation of the items used in the fire on July 2, 2019.
- k. Any information related to the communication with the items used in the fire of July 2, 2019.
- l. Any communication related to the fire on July 2, 2019.

Doc. 190 at 5-6. The Court agrees with Wright that "[w]ithout describing what is meant by either 'the fire on July 2, 2019,' or, [e.g.] 'items used in the fire,' [the] description[s] contains a fatal lack of particularity." *Id.* at 5. Further, the Government fails to explain how these references to the July 2, 2019 fire are sufficiently particularized, since their post-hearing brief is premised on the incorporation of the warrant's supporting affidavit. *See generally* doc. 194. As discussed below, however, suppression is inappropriate under *Leon* despite this deficiency.

Finally, Wright argues that subsection e "is not comprehensible" or "capable of being understood by a searching officer." Doc. 190 at 5. The subsection states:

- e. Any information related to the search of electrical power and electrical devices.

Dc. 32-1 at 7. The Court agrees with Wright that this category does not list items to be seized with sufficient particularity. The warrant does not

clarify the meaning of the broad term "search." *See id.* Further, even if the warrant specified that "search" refers to "internet search," the warrant does not clarify what it means to conduct an internet search related to the broad terms "electrical power" or "electrical devices." *Id.* Would information related to searches for biographical information on Thomas Edison be subject to seizure, for example? Nevertheless, as discussed below, suppression would be inappropriate under the *Leon* exception.

The second challenged category in the warrant is paragraph 2, which authorizes the search for "[e]vidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history." Doc. 190 at 6-7. As discussed above, several of "the things described in this warrant" are sufficiently particularized, while others are not. Accordingly, to the extent the warrant describes user attribution evidence related to a sufficiently particularized item to be seized, Wright's argument fails. However, to the extent an item is not sufficiently particularized (e.g., items related to the fire on July 2, 2019,

or items related to "financial beneficiaries"), paragraph 2 is not sufficiently particularized.[16]   As with the other defective categories addressed above, this should not be fatal to the warrant.

The third category of challenged information is in paragraph 3:

3. Records evidencing the use of the Internet, including:

> a. records of Internet Protocol addresses used;
>
> b. records of Internet activity, including firewall logs, caches, browser history and cookies, 'bookmarked' or 'favorite' web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

Doc. 190 at 7.  Wright briefly argues that the records in this paragraph "include anything related to use of the internet without any limiting language at all."  *Id.*  As discussed, however, the warrant limits the information to violations of specific statutes, and the Court cannot conclude that it is overbroad.  *See United States v. Archie*, 2016 WL 11650551, at *3 (N.D. Ga. Apr. 18, 2016) (warrant authorizing search for, *inter alia*, "subscriber information, registration information, [and] IP

---

[16] Wright argues that paragraph 2 is "too vague" because it fails to specify "what time period is relevant to a determination of whether any particular information is seizable." Doc. 190 at 7. As previously discussed, however, "the mere lack of temporal limitation [does] not render [the challenged warrant] unreliable at least based on the state of the law." *Addaquay*, 2021 WL 1899355, at *5.

(internet protocol) history, . . . for the [fifteen specified email accounts] . . . which are in violation of [specific statutes]" is "sufficiently particular").

Despite the deficiencies in the warrant's list of items, discussed above, suppression would be inappropriate under *Leon*. Wright points out that "depending on the circumstances of the particular case, a warrant may be so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." Doc. 197 at 4 (quoting *Leon*, 468 U.S. at 923). He briefly asserts that here, the "items to be seized are not particularized, [so] no reasonable officer could believe that the warrant was valid." Doc. 197 at 4. The warrant, however, is not as "glaring[ly] deficien[t]" as the warrant in *Groh*, where the Supreme Court held that the good faith exception did not apply when the warrant at issue listed a "single dwelling residence . . . blue in color." *Groh*, 540 U.S. at 558, 564. Further, "the magistrate judge's signature on the affidavit reduces the concern that he did not agree to the scope of the search as defined and limited therein. This demonstrates that one of the core purposes of the Fourth Amendment, preventing a 'general' search by having a magistrate restrict the scope of the search, was achieved here."

40

*United States v. Allen*, 625 F.3d 830, 839 (5th Cir. 2010); *see* doc. 32-2 at 35 (issuing magistrate's signature on affidavit).  Wright does not address whether officers' conduct was "deliberate enough to yield meaningful deterrence," *Campbell*, 26 F.4th at 886-87 (quoting *Davis*, 564 U.S. at 240), or that a constitutional violation was caused by a "systemic error or reckless disregard of constitutional requirements," *United States v. Nicholson*, 24 F.4th 1341, 1353 (11th Cir. 2022) (quoting *Herring*, 555 U.S. at 147); *see* doc. 197 at 3.  Wright's motion, doc. 32, as supplemented, doc. 190, should be **DENIED**.

### E. *Wright's suppression motion at doc. 33 should be denied.*

Wright moves to suppress all evidence obtained pursuant to a warrant authorizing the search of "records and information associated with the cellular . . . number [ending in 2822] . . . that are stored at premises controlled by Verizon."  Doc. 33-1 at 4 (Warrant); doc. 33 (suppression motion).[17]  Wright raises two arguments in favor of suppression: (1) "There are simply no facts alleged in the affidavit that would form a basis for probable cause to believe that the defendant's cell

---

[17]  The parties supplemented their briefing with oral argument at the hearing, doc. 188 (Minute Entry); however, they did not submit briefs supplementing the motion. *See generally* docket.

phone was used in any way to further the alleged crime", and (2) the affidavit relies on information obtained pursuant to the execution of the First 66th Street Warrant.[18]  Doc. 33 at 5.  Since the suppression motion challenging the First 66th Street Warrant has been denied, the latter argument fails.  The Court will, therefore, address Wright's argument that the affidavit fails to establish probable cause that evidence of the alleged crimes would be found in the cell phone records.

The affidavit supporting the warrant explains that Wright's ex-wife's car caught fire at approximately 7:41 PM on July 2, 2019, doc. 33-2 at 22, and that a phone number ending in 4976 "called into" the SIM card in the incendiary device to trigger the device.  *Id.* at 24.  It explains that based on, *inter alia*, interviews, Verizon records, EEU alarm system records, and surveillance footage from a business near EEU, *see id.* at 17-23, the affiant believes that Wright entered EEU on the day of the

---

[18]  At the hearing, Wright confirmed that he bases his fruit-of-the-poisonous-tree argument solely on the purported invalidity of the First 66th Street Warrant.  Doc. 188 (Minute Entry).  In the "Statement of Facts" portion of his motion at doc. 33, however, Wright states that the cell phone associated with the number ending in 2822 was one of the fifteen devices seized pursuant to the warrant challenged in his motion at doc. 32.  Doc. 33 at 3 (stating that "[doc. 32] and its attachments are hereby incorporated and made a part of this Motion[, doc. 33].").  The Court has recommended the motion at doc 32 be denied.  To the extent Wright argues that his motion at doc. 33 should be granted based on the suppression of evidence obtained pursuant to the warrant challenged in doc. 32, that argument fails.

explosion at 5:44 PM, left the 2822 cellular phone at EEU, and left EEU at approximately 6:03 PM. *Id.* at 23. Approximately 1 minute after the 7:41 PM fire, Wright returned to the EEU premises; he then left the premises "a few minutes later" with the 2822 cellular phone. *Id.*

The affiant states that the incendiary device was "triggered remotely with either a phone call or a message sent over a wireless network. Thus, any device capable of making phone calls or sending messages, such as wireless telephones and tablets that use a wireless network could have triggered the circuit remotely." Doc. 33-2 at 9. He further asserts that, based on his training and experience, it is possible that [Wright] used a device to connect remotely to the Internet to activate the [incendiary device] using EEU's modem and router." *Id.* at 19. Verizon records show that Wright sent his girlfriend a text message indicating that he would be home by 6:00 PM or 7:00 PM. *Id.* at 19. Between 6:31 PM and 7:44 PM, Wright's girlfriend called him eight times and text messaged him twice, indicating that she was "concerned and worried about him." *Id.*

The affidavit also states that law enforcement identified a PDF document on a computer at EEU listing, *inter alia*, Wright's financial

accounts and passwords.  Doc. 33-2 at 23.  One of the phrases on the document was "Cates phone lookout"; the affidavit explains that Lookout is a mobile security application available for cell phones which allows users to locate mobile devices on a map.  *Id.*  The ex-wife told investigators that although she was not familiar with the Lookout application, Wright commonly installed applications on her phone when they were married.  *Id.* at 24.  The affidavit states that law enforcement located an AT&T cell phone in the ex-wife's car.  *Id.* at 26.  The affiant states that he "believe[s] that this . . . cell phone was placed in the [vehicle] to be a tracking device, which allowed . . . Wright to log in remotely and track the [phone] . . . to know the location of the [vehicle] when the device was remotely detonated."  *Id.*

For the following reasons, the Court agrees with Wright that the warrant's application did not establish probable cause[19] that evidence of the alleged crimes would be found in the phone records.  However, suppression is inappropriate since the affidavit establishes at least a

---

[19] *See* doc. 33 at 4 ("The affidavit for the search warrant at issue is devoid of any facts that would logically lead to the conclusion that the cell phone records, including cell site location information, would contain evidence of the specified criminal activity."); *id.* at 5 ("There are simply no facts alleged in the affidavit that would form a basis for probable cause to believe that the defendant's cell phone was used in any way to further the alleged crime.").

*substantial basis* for the issuing magistrate's probable cause determination.  Further, even if the issuing magistrate did not have  a substantial basis, the *Leon* good faith exception precludes suppression.

At the hearing, the Government argued that the affidavit establishes probable cause that the Verizon data would contain two categories of information related to the alleged crimes: evidence that the phone number ending in 2822 was involved in (1) the triggering of the incendiary device, and (2) the tracking Wright's ex-wife's movements on the day of the explosion.  Doc. 188 (Minute Entry).  The affidavit does not articulate the 2822 phone's possible involvement in either of those functions.  *See generally* doc. 33-2.  To the contrary, the affidavit indicates that a phone number ending in 4976 "called into" the incendiary device's SIM card to trigger the device.  Doc. 33-2 at 24-25.  At the hearing, the Government noted the existence of programs which disguise phone numbers making calls, doc. 188 (Minute Entry); however, the affidavit does not mention those programs or suggest that the 2822 number was somehow disguised.  *See generally* doc. 33-2.  The strongest connection between the alleged crimes and the 2822 number is the affidavit's discussion of the 2822 phone's movements around the time of the

explosion, *see, e.g.*, *id*. at 22-23; however, the warrant issued on insufficient probable cause because the affidavit does not articulate a connection between those movements and (1) the device's trigger or (2) the vehicle tracking.

As discussed, however, "[a] reviewing court's task is not to make a *de novo* finding of probable cause but rather to decide whether the issuing magistrate—whose assessment of the affidavit's factual presentation is entitled to 'great deference'—had a 'substantial basis' for finding probable cause." *Rangel*, 2018 WL 817845, at *6 (quoting *Gates*, 462 U.S. at 236, 238-39). Although a more explicit connection between the alleged crimes and the 2822 number would strengthen the affidavit's articulation of probable cause, the affidavit's discussion of the phone's movements and the nature of the crime provided the issuing magistrate at least a substantial basis for finding probable cause. The affidavit details the affiant's belief that Wright left the 2822 number phone at EEU at approximately 6:03 PM. Doc. 33-2 at 23. Approximately 1 minute after the 7:41 PM fire, Wright returned to the EEU premises, and left the premises "a few minutes later" with the 2822 cellular phone. *Id*. at 23-24. The affidavit also explains that a circuit board similar to the one used

in the incendiary device can be activated "via three ways: IOS/Android APP software, computer software[,] and editing mobile messages." *Id.* at 9. It states that the affiant believes "it is possible that . . . Wright used a device to connect remotely to the Internet to activate the circuit board using EEU's modem and router." *Id.* at 19. Given these remote detonation capabilities and the movement of the 2822 phone closely corresponding to the time of the explosion, Wright has not explained why the issuing magistrate did not have a *substantial basis* for finding probable cause that evidence of the alleged crimes would be found in the records.

Finally, even if the affidavit does not establish a substantial basis for finding probable cause that evidence of the alleged crimes would be found in the records associated with the number ending in 2822, suppression would be inappropriate under the *Leon* exception. The entirety of Wright's argument that the *Leon* exception does not apply is as follows:

> The affiant in this case was an ATF agent who executed the warrant and signed the return on January 13, 2020. Since he submitted the application for the warrant, and was part of the law enforcement team which participated in the search of 205 E. 66th Street in which the cell phone was seized, he would have known that the affidavit for the search of Verizon's

> records related to the cell phone . . . failed to establish any
> nexus between the described records and either the defendant
> or the alleged crimes, and that he should not have applied for
> the warrant.

Doc. 33 at 6-7. As discussed, Wright has not shown that the affidavit did not provide at least a substantial basis for finding probable cause that evidence of the alleged crimes would be found in the Verizon records. Further, Wright does not suggest that any law enforcement officer's conduct was "deliberate enough to yield meaningful deterrence", *Campbell*, 26 F.4th at 886-87 (quoting *Davis*, 564 U.S. at 240). *See generally* doc. 33. Wright's motion should therefore be **DENIED**. Doc. 33.

   F. *Wright's suppression motion at doc. 34 should be denied.*

Wright moves to exclude evidence obtained pursuant to sixteen warrants authorizing the seizure of "cell site location data and other private information requested from Google, Verizon and other providers[.]" Doc. 34 at 2-4. At the hearing, Wright withdrew his challenges to several of those warrants. *See* doc. 188 (Minute Entry). Wright's post-hearing brief lists the remaining challenged warrants:

   (a) "Information that is Stored at Premises Controlled by
   Google" issued on July 19, 2019.

(b) "Information Associated with Particular Cellular Towers" issued on July 25, 2019.

(d) "Information Associated with Particular Cellular Towers" issued on July 25, 2019.

(e) "Information Associated with Particular Cellular Towers" issued on July 25, 2019.

(f) "Information Associated with Particular Cellular Towers" issued on July 25, 2019.

(k) "Information Associated with 63Pandora@gmail.com, BARRYEEU@gmail.com, Contractannual33@gmail.com" issued November 20, 2019.

(m) "Information Associated with 63Pandora@gmail.com, BARRYEEU@gmail.com, Contractannual33@gmail.com" issued December 20, 2019.

(n) "Associated With the Cellular Device Assigned Call Number 912-667-2822 that is Stored at Verizon, [sic]" issued on December 20, 2019.

Doc. 191 at 1-2 (listing withdrawn and remaining challenges); *id.* at 2 n.1; doc. 34 at 3-4 (Wright's original motion lists the names of the remaining challenged warrants).[20]

---

[20] The Court will retain the letter designations for the warrants used in Wright's original motion, doc. 34 at 3-4, and in his post-hearing brief, doc. 191 at 1-2. Consistent with Wright's motion, the Court will refer to warrant (a) as the "Geofence Warrant," and warrants (b), (d), (e), and (f) as the "Tower Dump Warrants." Additionally, Wright did not include the warrants or their supporting affidavits as attachments to his motion at doc. 34, and the citations associated with the warrants in Wright's motion do not correspond to entries on this case's docket. *See* doc. 34 at

1. *Wright's challenge to the Geofence Warrant.*

Wright argues that the evidence obtained from Google pursuant to Warrant (a) (the "Geofence Warrant"), doc. 46-11, must be suppressed. *See, e.g.*, doc. 191 at 4. The Eastern District of Virginia has succinctly explained the nature and purpose of geofence warrants:

> Geofence warrants represent a novel but rapidly growing investigatory technique. [Cit.] When law enforcement seeks a geofence warrant from Google, it (1) identifies a geographic area (also known as the "geofence," often a circle with a specified radius), (2) identifies a certain span of time, and (3) requests Location History data for all users who were within that area during that time. [Cit.] The requested time windows for these warrants might span a few minutes or a few hours.

*United States v. Chatrie*, 590 F. Supp. 3d 901, 914 (E.D. Va. 2022) (quotations and citations omitted). "Unlike a warrant authorizing surveillance of a known suspect, geofencing is a technique law enforcement has increasingly utilized when the crime location is known but the identities of suspects is not." *United States v. Rhine*, 2023 WL 372044, at *17 (D.D.C. Jan. 24, 2023). The Middle District of Alabama recently noted that courts evaluating geofence warrants are "in

---

3-4. The Court will cite the warrants which were attached to the Government's response as exhibits. *See* doc. 46.

uncharted territory in light of the paucity of decisions in [the Eleventh Circuit], and nationwide" on the topic.  *United States v. Davis*, 2022 WL 3009240, at \*7 (M.D. Ala. July 1, 2022) (quotations omitted).[21]

The challenged Geofence Warrant authorizes the search for user data from 50-meter radii around five separate locations on July 2, 2019 (the day of the explosion, which occurred at approximately 7:41 PM), between 5:00 PM and 9:30 PM.  Doc. 46-11 at 2-3.  The affidavit supporting the Geofence Warrant identifies those locations as (1) the street intersection where the explosion occurred, *id.* at 14, (2) Wright's ex-wife's residence, *id.* at 18, (3) Wright's residence, *id.* at 19, (4) Candler Hospital in Savannah, where Wright's ex-wife was employed, *id.* at 18-19, and (5) EEU, where Wright was employed, *id.* at 22.  The warrant requires Google to provide anonymized data related to users captured in the geofences.  *Id.* at 32.  After Google provides the anonymized data, it is "required to disclose identifying information . . . for the Google Account associated with each device ID about which the government inquires."

---

[21]  Given the dearth of authority on geofence warrants, several of the opinions discussed below are issuing magistrates' determinations regarding whether to issue geofence warrants, and others are courts evaluating motions to suppress evidence obtained pursuant to geofence warrants.  Although the warrant issuance inquiry is distinct from the suppression inquiry, the warrant issuance opinions include helpful discussions of probable cause, overbreadth, and particularity.

*Id.* Although courts have issued warrants implementing similar de-anonymization procedures, *see, e.g.*, *Matter of Search Warrant Application for Geofence Location Data Stored at Google Concerning an Arson Investigation*, 497 F. Supp. 3d 345, 353 (N.D. Ill. 2020) ("Arson"), they have been "met with some skepticism by courts to have considered them," *Matter of Search of Info. that is Stored at Premises Controlled by Google LLC*, 579 F. Supp. 3d 62, 87 (D.D.C. 2021) ("District of Columbia"); *see also Chatrie*, 590 F. Supp. 3d at 934 (noting that a similar de-anonymization procedure "leave[s] the executing officer with *unbridled* discretion and lack[s] any semblance of objective criteria to guide how officers would narrow the lists of users." (emphasis in original)).[22]

> Wright argues:
>
> [T]he government did not have probable cause to search Google accounts unrelated to the crime. While the government possessed evidence that a crime was committed by someone, and had arrested Mr. Wright for the crime, the warrant application did not set forth evidence that everyone present at the 5 locations identified in the warrant was guilty of a crime. . . . [T]he geofence warrant swept up user location

---

[22]   Courts have suggested that geofence warrants which only permit de-anonymization "pursuant to a further directive from the Court" are preferable. *District of Columbia*, 579 F. Supp. 3d at 87; *see also Rhine*, 2023 WL 372044, at *32 (Geofence warrant is sufficiently particular when it, *inter alia*, "preclude[s] disclosure of deanonymized device information except after separate order of the court based on a supplemental affidavit.").

> data of persons unrelated to any criminal activity. . . . The
> geofence warrant lacked particularized probable cause and
> the search should be suppressed.

Doc. 191 at 4-5. To the extent Wright contends that the Geofence

Warrant authorized an overbroad search and did not list the "things to

be seized" with sufficient particularity, the Court agrees, as discussed

below. However, Wright's suppression motion should be **DENIED**

because he has not carried his burden of showing that he has standing to

challenge the Geofence Warrant. Further, even if he had standing, the

Government's *Leon* argument would carry the day.[23]

---

[23] It is unclear whether "the government's collection of location information, particularly location data covering . . . only short periods of time, [is] a 'search' requiring a warrant." *District of Columbia*, 579 F. Supp. 3d at 74 n.14 (citing *Carpenter v. United States*, ___ U.S.___, 138 S. Ct. 2206, 2234 (2018) (Kennedy, J., dissenting)). In *Carpenter*, the Supreme Court held that the government's "acquisition of cell-site records was a search within the meaning of the Fourth Amendment." 138 S. Ct. at 2220. The Court reasoned that since carrying a cell phone is "indispensable to participation in modern society", *id.*, and since a cell phone user "continuously reveals his location to his wireless carrier", *id.* at 2216, "when the Government tracks the location of a cell phone it achieves near perfect surveillance, as if it had attached an ankle monitor to the phone's user", *id.* at 2218. Here, however, the affidavit explains that Google collects the location data captured in a geofence when users choose to enable Google location services. *See* doc. 46-11 at 11-12. Neither party addresses whether Google location services are, e.g., "indispensable to participation in modern society," and the *Carpenter* Court was clear that it "d[id] not express a view on matters not before [it.]" *United States v. Trader*, 981 F.3d 961, 968 (11th Cir. 2020) (Pryor, C.J.); *see also In re Warrant Application for Use of Canvassing Cell-Site Simulator ("Simulator")*, 2023 WL 1878636, at *2 (N.D. Ill. Feb. 1, 2023) ("Whether [cell-site simulator] use constitutes a Fourth Amendment search presents an interesting and open question on which only a handful of courts have opined.") (compiling cases); *but see Chatrie*, 590 F. Supp. 3d at 935-36 ("Google Location History information—perhaps even more so than the cell-site location information at issue in

i.   Wright's reliance on *Ybarra v. Illinois*, 444 U.S. 85 (1979).

Before addressing the validity of the Geofence Warrant and Wright's standing to challenge it, the Court will address Wright's argument that that the Geofence Warrant must "set forth evidence that everyone present at the 5 locations identified in the warrant was guilty of a crime." Doc. 191 at 4. He derives this proposed standard from *Ybarra v. Illinois*, 444 U.S. 85 (1979). *See id.* at 4-5; doc. 196 at 3. In *Ybarra*, law enforcement obtained a warrant to search a tavern and a bartender in the tavern for drugs; however, officers expanded the search to include bar patrons not listed in the warrant. 444 U.S. at 88-89. The Supreme Court explained that the police "possessed a warrant based on probable cause to search the tavern in which Ybarra happened to be at the time the warrant was executed. But a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Id.* at 91.

---

*Carpenter*—is 'detailed, encyclopedic, and effortlessly compiled.' " (quoting *Carpenter*, 138 S. Ct. at 2216)). Given Wright's lack of standing and the applicability of the *Leon* exception, discussed below, the Court "assumes (but does not decide) that the Fourth Amendment's restrictions on searches and seizures apply to the collection of cell phone location history information via a geofence." *District of Columbia*, 579 F. Supp. 3d at 74.

Wright also cites *Chatrie*, which applied *Ybarra* in the geofence context. *See* doc. 191 at 4-5. In *Chatrie*, the court found that a geofence warrant lacked sufficient probable cause when it "provided the Government unlimited discretion to obtain from Google the device IDs . . . of anyone whose Google-connected devices traversed the geofences . . . based on nothing more than the 'propinquity' of these persons to the Unknown Subject at or near the time of the criminal activity." *Chatrie*, 590 F. Supp. 3d at 931 (quotations and citations omitted).

The Northern District of Illinois, however, recently rejected a standard similar to the one proposed by Wright. *See Simulator*, 2023 WL 1878636, at *10.[24] In *Simulator*, the court noted the general rule is that "[o]nce the government has established probable cause with respect to a specific location, and a warrant issues, law enforcement may search the

---

[24] In *Simulator*, law enforcement utilized an investigative technique known as a canvassing cell-site simulator. 2023 WL 1878636, at *1. The Court explained that a cell-site simulator is a device that imitates a cell tower and "induces nearby cell phones to connect and reveal their direction relative to the [simulator]." *Id.* at *3. A simulator is "canvassing" when it is used to "identify an unknown cellular device's [data]. . . . Because the specific device sought by law enforcement is not yet known at the time the [canvassing simulator] is used, [it] obtains the [data] associated with each of the devices within the [canvassing simulator's] coverage area." *Id.* at *4. Although canvassing simulators are technically distinct from geofences, the *Simulator* Court noted that cases addressing geofence warrants are instructive since geofences serve a similar function. *Id.* at *8. For this reason, the Court finds the *Simulator* Court's discussion of canvassing simulators instructive in this case.

entirety of the identified location for the identified contraband or evidence." *Id.* The Court explained that *Ybarra* articulated an *exception* to that rule "*for the physical bodies of persons* who are present during the search of a location for which the government has obtained a warrant." *Id.* at *11 (emphasis in original). The *Simulator* Court persuasively distinguished the probable cause issues regarding canvassing cell-site simulator warrants from the issues in *Ybarra*:

> [C]apturing a signal given off by a cellular device that provides only limited albeit important information . . . is not the same as the search of a body of a person, such that *Ybarra* would be implicated. There is no physical intrusion on a person's body involved in use of a [canvassing cell-site simulator]; it is more akin to a search for specific information within a place for which the government has obtained a search warrant.

*Id.* at *11; *see also* Orin Kerr, *The Fourth Amendment and Geofence Warrants: A Critical Look at* United States v. Chatrie, Lawfare (March 12, 2022), *available at* https://www.lawfareblog.com/fourth-amendment-and-geofence-warrants-critical-look-united-states-v-chatrie.

The Court agrees with the *Simulator* Court's view that "[t]he correct formulation . . . is that the government must show probable cause that evidence of the crime(s) alleged will be found *in the particular place to be searched.*" 2023 WL 1878636, at *11 (emphasis in original); *see also*

*Arson*, 497 F. Supp. 3d at 361 ("[T]he fact that one uninvolved individual's privacy rights are indirectly impacted by a search is present in numerous other situations and is not unusual."). "[A]n additional but important caveat to this standard is that the warrant must also meet the Fourth Amendment's particularity requirements." *Simulator*, 2023 WL 1878636, at *12.

The Government asserts, and Wright does not dispute, that the affidavit supporting the warrant provided the issuing magistrate a substantial basis for finding probable cause that evidence of the alleged crimes would be found within five geofence parameters. *See* doc. 193 at 6 (Government's brief); *see generally* docs. 34, 191 & 196 (Wright's briefs). Wright's arguments that the Geofence Warrant "swept up user location data of persons unrelated to any criminal activity", doc. 191 at 5, and that "the government did not have probable cause to search Google accounts unrelated to the crime", *id.* at 4, are more accurately characterized as arguments that the Geofence Warrant fails the Fourth Amendment's particularity and overbreadth limitations. *See, e.g.*, *Arson*, 497 F. Supp. 3d at 363 (Courts are "concerned with overbreadth, namely, whether the [geofence] warrant sweeps too broadly to capture location information

that has no connection to the crime."); *Rhine*, 2023 WL 372044, at \*28,

\*32 (discussing particularity and overbreadth).  The Court will address

these arguments below.

> ii.  The Geofence Warrant was overbroad and insufficiently particularized.

"[I]t is easy for a geofence warrant, if cast too broadly, to cross the

threshold into unconstitutionality because of a lack of . . . particularity[ ]

and overbreadth concerns under Fourth Amendment jurisprudence."

*Arson*, 497 F. Supp. 3d at 353.  "The concept of overbreadth is related to

particularity, but is distinct from it."  *Matter of Search of Info. Stored at*

*Premises Controlled By Google*, 2023 WL 2236493, at \*11 (S.D. Tex. Feb.

14, 2023) ("Texas").  A warrant is overbroad if its "authorization exceed[s]

the scope of probable cause on which it issued."  *Rhine*, 2023 WL 372044,

at \*28.  A warrant fails the particularity requirement if it does not

"describe[ ] the items to be seized with enough specificity that the

executing officer is able to distinguish between those items which are to

be seized and those that are not[.]"  *Chatrie*, 590 F. Supp. 3d at 928

(quotations and citation omitted); *see also Simulator*, 2023 WL 1878636,

at \*13 ("The particularity requirement with respect to the items to be

searched for or seized is satisfied if the warrant describes the items with

reasonable specificity." (quotations and citation omitted)). Courts evaluating the breadth of geofence warrants consider whether the warrant is sufficiently tailored to, *e.g.*, "minimize[ ]" the possibility that law enforcement will obtain "location data from uninvolved individuals[.]" *Arson*, 497 F. Supp. 3d at 358; *see also District of Columbia*, 579 F. Supp. 3d at 85 (issuing geofence warrant which "does not have the potential of sweeping up the location data of a substantial number of uninvolved persons."). This analysis requires a "case-by-case determination", *United States v. Smith*, 2023 WL 1930747, at *10 (N.D. Miss. Feb. 10, 2023), since there are "numerous ways in which the government can satisfy . . . concerns about . . . overbreadth." *Arson*, 497 F. Supp. 3d at 363.

In *Matter of Search of Info. Stored at Premises Controlled by Google*, 2020 WL 5491763 (N.D. Ill. July 8, 2020) ("Pharma I"), the court rejected an application for a geofence warrant in a case involving a transaction of stolen pharmaceuticals. *Id.* at *1. Law enforcement sought several circular geofences with 100-meter radii, and 45-minute durations. *Id.* One geofence location was in "a densely populated city, and the area contain[ed] restaurants, various commercial establishments, and at least

one large residential complex[.]" *Id.* Another location "includ[ed] medical offices and other single and multi-floor commercial establishments that are likely to have multiple patrons during [the geofence's timeframe]." *Id.* The Court rejected the application because, among other reasons, "the area covered by each of the geofence applications is large, and the majority of the area sought encompasses structures and businesses that would necessarily have cell phone users who are not involved in these offenses." *Id.* at *3; *see also id.* at *7 ("The government's warrant application suffers from overbreadth[.]").

Similarly, in *Matter of Search of Info. that is Stored at Premises Controlled by Google, LLC*, 542 F. Supp. 3d 1153 (D. Kan. 2021) ("Kansas"), the court found that a proposed geofence warrant failed the Fourth Amendment's overbreadth test when the application did "not address the anticipated number of individuals likely to be encompassed within the [geofence]", *id.* at 1157, and when the geofence boundary "encompasses two public streets, so anyone driving their automobile by the target location during the relevant time period could be identified in the data" *id.* at 1158. *See also, id.* at 1158 ("[T]he application does not

explain the extent to which the geofence, . . . is likely to capture uninvolved individuals from those surrounding properties.").[25]

Finally, the *Chatrie* Court found the warrant at issue to be overbroad based on the potential for the geofence parameters to capture data from uninvolved individuals:

> Indeed, it is difficult to overstate the breadth of this warrant, particularly in light of the narrowness of the Government's probable cause showing. . . . [L]aw enforcement simply drew a circle with a 150-meter radius that encompassed the Bank, the entirety of the Church, and the Church's parking lot.[ ] The Government then requested location information for *every device* within that area. . . . What is more, in one instance, this Geofence Warrant captured location data for a user who may not have been remotely close enough to the Bank to participate in or witness the robbery.

*Chatrie*, 590 F. Supp. 3d at 930 (emphasis in original) (citations and footnote omitted).

Two cases provide a helpful discussion of geofence warrants which are not overbroad.  In *Arson*, the government applied for a geofence warrant during its investigation of approximately 10 arsons committed

---

[25] In *Kansas*, the Court also denied the geofence warrant application because it did not "establish a fair probability—or any probability—that the identity of the perpetrator or witnesses would be encompassed within the search."  542 F. Supp. 3d at 1157.  As discussed, Wright does not argue that the Geofence Warrant's application did not establish a substantial basis for finding probable cause that evidence of the alleged crimes would be identified in the geofence's parameters.

in the Chicago area.  497 F. Supp. 3d at 351.  The Court issued the warrant, noting that the time parameters were 15-30 minutes in each target location.  *Id.* at 357.  The court also emphasized the narrow geographical tailoring of each geofence.  *Id.* ("The target locations have been narrowly crafted to ensure that location data, with a fair probability, will capture evidence of the crime only.").  For example, one of the target locations was a street leading to a location where arson occurred.  *Id.*  The geofences encompassing the street "comprise[d] an 'L' shape of roadway, with each segment of the 'L' being approximately the length of half a city block."  *Id.*[26]

In *Rhine*, the court denied a criminal defendant's suppression motion regarding a geofence warrant issued during the investigation of the January 6, 2021 Capitol riot.  2023 WL 372044, at *24.  The court found that the geofence warrant was not overbroad because, *inter alia*,

---

[26] *See also Arson*, 497 F. Supp. 3d at 358 ("[T]he geofence zones have been constructed to focus on the arson sites and the streets leading to and from those sites.  Residences and commercial buildings along the streets have been excluded from the geofence zones.  The approximate time of the crimes also limits the warrant's scope – the crimes occurred in the early hours of the morning when commercial businesses are usually closed and unoccupied.  Streets in the wee hours of the morning in the City of Chicago are generally sparsely populated by pedestrians, and roads have few cars traversing through them.  Furthermore, the affiant has provided additional information obtained through the investigation to support the conclusion that location data from uninvolved individuals will be minimized.").

"the geofence area closely, although not perfectly, contour[ed] the Capitol building itself, and [did] not include the vast majority of the plazas or grounds surrounding the building." *Id.* at \*31. The Court also noted that the geofence warrant was supported by an "unusually broad scope of probable cause", *id.* at \*30, since "the Capitol building was not open to the public on January 6 due to the counting of the votes of the Electoral College, [and] the fact of having entered the building during the geofence timeframe itself constitutes evidence of a crime," *id.* at 29.

In this case, although the Government emphasizes that the Geofence Warrant locations "were limited to only fifty meter[ ] [radii]" and "structured with time limitations that were tailored and specific to the time frame of the car bombing", doc. 193 at 5, the Government does not point to any portion of the affidavit describing the specific locations, or explaining why the geographic and temporal parameters minimize the potential for capturing data from irrelevant users. *See, e.g.*, *Smith*, 2023 WL 1930747, at \*8 ("Although the parameters of the geofence were relatively large in scope, the geofence was in a rural area where it was unlikely to return a large number of Google accounts."); *Rhine*, 2023 WL 372044, at \*31 (noting that "the area around the Capitol is unusual for

its lack of nearby commercial businesses or residences."). *Cf. Matter of Search of Info. Stored at Premises Controlled by Google*, 481 F. Supp. 3d 730, 743 (N.D. Ill. 2020) ("Pharma II") ("Location 1 is situated within a busy commercial and residential area on a major arterial street in a major U.S. city, and that more than 100 residential units of varying size are in the whole of the building that houses Location 1."). Here, "law enforcement simply drew . . . circle[s] with . . . [50]-meter radi[i] that encompassed" businesses, residential neighborhoods, public streets, and a major hospital in Savannah. *Chatrie*, 590 F. Supp. 3d 930. Accordingly, the Court agrees with Wright that the Geofence Warrant was overbroad.

Wright also suggests that the warrant fails the Fourth Amendment's particularity requirement. *See, e.g.*, doc. 191 at 4. As discussed above, a search is unconstitutional if it is based on a warrant that fails to sufficiently particularize the place or things to be seized. *Travers*, 233 F.3d at 1329-30. A description is sufficiently particular when it enables the searcher to reasonably ascertain and identify the things to be seized. *Bradley*, 644 F.3d at 1259.

Although the parties do not thoroughly brief the issue, the *Rhine* Court's discussion of particularity suggests that the Geofence Warrant

did not list the "things to be seized" with sufficient particularity. *See* 2023 WL 372044, at *32. The court emphasized issuing magistrates' concern regarding geofence warrants with de-anonymization procedures similar to the procedure in this case, which "includes no criteria or limitations as to which cellular telephones the government agents can seek additional information." *Id.* (quoting *Pharma I*, 2020 WL 5491763, at *1). In contrast, the geofence warrant at issue in *Rhine* was sufficiently particularized when it established "a series of [de-anonymization] steps with a court's authorization in between[.]" *Id.* (quoting *Chatrie*, 590 F. Supp. 3d at 933). Further, although the *Arson* Court suggested that geofence warrants which allow law enforcement to de-anonymize any user data at will are not necessarily insufficiently particularized, the issuing magistrate approved the warrant in that case because "the government . . . established probable cause to seize all location and subscriber data within the geofence locations identified."

*Arson*, 497 F. Supp. 3d at 362.[27]  Here, given the breadth of the Geofence

Warrant's parameters, discussed above, and law enforcement's

"unbridled discretion to decide which accounts will be subject to further

intrusions", *Chatrie*, 590 F. Supp. 3d at 927, the Court finds that the

Geofence Warrant does not satisfy the Fourth Amendment's particularity

requirements.

       iii.   <u>Wright has not shown that he has standing to
challenge the Geofence Warrant.</u>

The Government argues that Wright lacks "standing" to challenge

the Geofence Warrant.[28]  Doc. 193 at 3-5.  "In order to have evidence

suppressed based on a violation of the Fourth Amendment, a claimant

has the burden of proving . . . that the claimant had a legitimate

---

[27]  The *Arson* Court also noted that "the fact that the government has requested anonymized data in the first step, and then at its discretion, can request subscriber information for all or some of the location data, is merely a process established for practical concerns rather than constitutional necessity.  Google has established this procedure, which avoids the need for Google to produce large amounts of subscriber data to the government at the outset. [Cit.] Simply because the government is obtaining anonymized data at the outset does not minimize constitutional concerns because the government retains the discretion of obtaining all subscriber data should it so choose." 497 F. Supp. 3d at 362.

[28]  Courts have frequently lamented that the personal-interest element of a Fourth Amendment challenge has come to be known as "standing," as that terminology creates confusion with the requirement of a justiciable "case or controversy."  The Supreme Court has clearly established that, in the Fourth Amendment context, "standing is subsumed under substantive Fourth Amendment doctrine, it is not a jurisdictional question . . . ." *Byrd v. United States*, ___ U.S. ___, 138 S. Ct. 518, 1530 (2018).

expectation of privacy." *United States v. McKennon*, 814 F.2d 1539, 1542 (11th Cir. 1987) (citing *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980)). To make the required showing, the individual must demonstrate a "subjective expectation of privacy in the object of the challenged search," and that "society [is] willing to recognize that expectation as legitimate." *Id.* at 1542-43. "An individual's Fourth Amendment rights are *not* infringed—or even implicated—by a search of a thing or place in which he has no reasonable expectation of privacy." *United States v. Ross*, 963 F.3d 1056, 1062 (11th Cir. 2020) (emphasis in original).

The Supreme Court has emphasized that "the defendant's Fourth Amendment rights are violated only when the challenged conduct invaded *his* legitimate expectation of privacy rather than that of a third party." *United States v. Payner*, 447 U.S. 727, 731 (1980) (emphasis in original). Accordingly, "[b]ecause privacy is personal, a party must demonstrate that their own privacy rights are at stake." *Davis*, 2022 WL 3009240, at *7 (citing *Presley v. United States*, 895 F.3d 1284, 1289 (11th Cir. 2018)).

As discussed, Wright argues that the Geofence Warrant was invalid because it impermissibly captured user data from individuals other than

him, e.g., "Google accounts [in the geofences] unrelated to the crime," and "everyone present at the 5 locations." Doc. 191 at 4; *see id.* at 4-5; doc. 196 at 2-3. Although the Court agrees with Wright that the Geofence Warrant is overbroad, he has not even suggested that the Geofence Warrant violated a constitutional right " 'as to him,' personally." *United States v. SDI Future Health, Inc.*, 568 F.3d 684, 695 (9th Cir. 2009) (quoting *Mancusi v. DeForte*, 392 U.S. 364, 367 (1968)).

In *Davis*, the Middle District of Alabama rejected an argument similar to Wright's. *See* 2022 WL 3009240, at *8. In that case, law enforcement obtained a geofence warrant during an investigation of a series of carjackings where the stolen cars were used to commit robberies. *Id.* at *1. During the de-anonymization process, Google provided identifying information related to a Gmail account captured in a geofence that did not belong to Davis, the defendant. *Id.* at *4. Law enforcement used the information to identify Davis as a suspect. *Id.* at *5. Like Wright, Davis argued that "because the [geofence warrant] authorized a search of every Google user who happened to be near certain locations on certain dates, it lacked the particularity required by the Fourth Amendment . . . and that evidence derived therefrom should be

68

suppressed." *Id.* (quotations omitted).    The court denied Davis'

suppression motion, explaining:

> . . . Davis has not shown that he had a reasonable expectation
> of privacy in the . . . Gmail account or device associated
> therewith that was searched.   Davis has not presented any
> evidence  showing  a  connection  to,  association  with,  or
> possession of the Gmail account or device. . . . The device
> connected to the . . . Gmail account was not chronicling Davis'
> movements, but the movements of some other person who
> possessed the device.

*Id.* at *8.

Wright, similarly, has not shown any connection or association with

the data that was impermissibly "swept up", doc. 191 at 4, and he has not

carried his burden of establishing standing.  *See United States v. Rhodes*,

2022 WL 1261811, at *8 (D. Or. Apr. 28, 2022) ("Defendant lacks standing

to challenge the search or seizure of any of these phones, all of which

belong to other individuals.    Defendant maintains neither a property

interest nor a reasonable expectation of privacy in the cell phone records,

location data, or messages of third parties."); *see also, e.g., Alderman v.

United States*, 394 U.S. 165, 174 (1969) ("Fourth Amendment rights are

personal rights which . . . may not be vicariously asserted.").

Confusingly, Wright attempts to distinguish this case from *Davis*

by asserting that it "does not offer a useful comparison, as that court

found that the defendant had no reasonable expectation of privacy over data associated with an account that was not owned by him." Doc. 196 at 3. As discussed, Wright premises his suppression argument on the overbreadth of the Geofence Warrant as to accounts "not owned by him", *i.e.*, "everyone present at the 5 locations." Doc. 191 at 4. Wright also cites *Pharma II*, which he characterizes as "[finding] that [a] warrant for geofence data intruded upon a citizen's reasonable expectation of privacy." Doc. 196 at 2-3 (citing 481 F. Supp. 3d at 734). In *Pharma II*, however, the court denied a geofence warrant application because it was overbroad and insufficiently particularized. *See* 481 F. Supp. 3d at 756-57. Although the court noted the Government's concession that the proposed geofences "are a 'search' for Fourth Amendment purposes" and emphasized the privacy concerns raised by geofence warrant, it did not address whether a defendant can premise a geofence warrant suppression motion on intrusions into third parties' data. *See id.* at 736-38.

The Court acknowledges Wright's concern that the use of geofence warrants can constitute an intrusive investigative technique which casts too wide a net. The *Chatrie* Court echoed this concern, noting that it was

70

"disturbed that individuals other than criminal defendants caught within expansive geofences may have no functional way to assert their own privacy rights. . . . . [B]ecause that individual would not have been alerted that law enforcement obtained his or her private location information, and *because the criminal defendant could not assert that individual's privacy rights in his or her criminal case*, [cit.], that innocent individual would seemingly have no realistic method to assert his or her own privacy rights tangled within the warrant." 590 F. Supp. 3d at 926 (emphasis added); *id.* (quoting *Hawkins v. Barney's Lessee*, 30 U.S. 457, 463 (1831) ("Geofence warrants thus present the marked potential to implicate a 'right without a remedy.' ")).  However, "[a]t base, these matters are best left to legislatures."  *Id.*

### iv.   Suppression is not appropriate under the *Leon* good faith exception.

Even if Wright had standing to challenge the search authorized by the Geofence Warrant, suppression would be inappropriate pursuant to the *Leon* good faith exception.  Wright briefly argues that the warrant's deficiencies are so significant that the exception should not apply.  Doc. 191 at 5-6.  As the *Chatrie* Court recognized, however, geofence warrants are a novel investigative technique, and their "permissibility . . . is a

complex topic, requiring a detailed, nuanced understanding and application of Fourth Amendment principles, which police officers are not and cannot be expected to possess." 590 F. Supp. 3d at 938. This is especially true in light of the "paucity of decisions" on the issue. *Davis*, 2022 WL 3009240, at \*7; *Chatrie*, 590 F. Supp. 3d at 917, 938 (noting that when law enforcement obtained a geofence warrant on June 14, 2019, approximately one month before the Geofence Warrant in this case issued, "no court had yet ruled on the legality of such a technique."); doc. 46-11 at 28 (Geofence Warrant issued July 19, 2019); *see also United States v. Carpenter*, 2023 WL 3352249, at \*12 (M.D. Fla. Feb. 28, 2023) (denying a motion to suppress evidence obtained pursuant to a geofence warrant under the good faith exception, and noting that "the legality of geofence warrants is a cutting-edge issue based on how recently geofence warrants have been used and challenged."). Accordingly, "the conduct of law enforcement in this case seems reasonable and appropriate when considering the specific circumstances with which the investigators were faced." *Smith*, 2023 WL 1930747, at \*12 (denying motion to suppress evidence obtained pursuant to geofence warrant under the "good faith exception"). Finally, suppression would be inappropriate because Wright

does not even suggest that officers' conduct was "deliberate enough to yield meaningful deterrence[.]" *Campbell*, 26 F.4th at 886-87 (quoting *Davis*, 564 U.S. at 240); *see generally* docs. 34, 191 & 196.   Wright's request to suppress evidence obtained pursuant to the Geofence Warrant should be **DENIED**.  Doc. 34, in part.

### 2. *Wright's challenge to the Tower Dump Warrants.*

Wright argues that the Court must suppress evidence obtained pursuant to Warrants (b), (d), (e), and (f), which authorized "tower dumps" from four cell phone service providers.  Doc. 191 at 6-7; *see also* docs. 46-12, 46-14, 46-15 & 46-16 (collectively, the "Tower Dump Warrants").  A tower dump is "a download of information on all the devices that connected to a particular cell site during a particular interval[.]"  Wayne R. LaFave, 1 Search & Seizure § 2.7(f) (6th ed. 2022).  Here, the Tower Dump Warrants authorized law enforcement to obtain, *inter alia*, telephone call numbers and "unique identifiers" for each wireless device in the towers' vicinities, the source and destination phone numbers associated with each cellular communication, the

date/time/duration of each cellular communication, and the "face" of each tower that received each communication.  *See, e.g.*, doc. 46-12 at 4-5.[29]

> Wright bases his brief argument on an analogy to *Ybarra*:

> The tower dump warrants and searches fail for the same reason that the geofence warrant fails.  Even though the government here had Mr. Wright in custody, knew his cell phone number and possessed his cell phone, it swept up cellular data for countless uninvolved device users simply because they were found in the place to be searched.  That, again, is the same argument rejected in *Ybarra.* [Cit.]  Such "all persons" warrants can be upheld only if there is reason to believe that all the people present were believed to be participants in criminal activity.

Doc. 191 at 6-7 (citing *Marks v. Clarke*, 102 F.3d 1012, 1029 (9th Cir. 1996)).  For the reasons discussed in the Court's analysis of the Geofence Warrant, the Court rejects Wright's proposed standard requiring "reason to believe that all the people present [presumably, people whose data was captured in the tower dump] were believed to be participants in criminal activity."  *Id.* at 7.  Wright does not explain why law enforcement downloading tower dump data is akin to the physical intrusion on a person's body at issue in *Ybarra*, nor does he address recent cases decided before the hearing expressly rejecting his proposed standard.  *See Matter*

---

[29] The other three Tower Dump Warrants include the same list of data to be seized; accordingly, the Court cites the warrant at doc. 46 for ease of reference.

*of Tower Dump Data for Sex Trafficking Investigation*, 2023 WL 1779775, at *3 (N.D. Ill. Feb. 6, 2023) ("[T]he question of whether there is probable cause to authorize the collection of cell tower dump data is not a difficult one.  In examining an application for a warrant, the Court must inquire as to whether probable cause exists that a crime has been committed and that evidence of the crime will be located at the place to be searched."); *Simulator*, 2023 WL 1878636, at *11 ("[C]apturing a signal given off by a cellular device that provides only limited albeit important information . . . is not the same as the search of a body of a person, such that *Ybarra* would be implicated.").

Further, as with his argument regarding the Geofence Warrant, Wright has not carried his burden of establishing standing.  His suppression argument regarding the Tower Dump Warrants is wholly premised on their overbreadth as to individuals *other than him*.  *See, e.g.*, doc. 191 at 6 ("[The Tower Dump Warrants] swept up cellular data for countless uninvolved device users[.]").  In his reply, Wright asserts that he had a reasonable expectation of privacy in his data captured in the tower dump.  *See* doc. 196 at 2-3.  He does not argue, however, that the affidavit failed to establish probable cause that evidence of the alleged

crimes would be found in the data, or that the Tower Dump Warrants violated a constitutional right " 'as to him,' personally." *SDI Future Health, Inc.*, 568 F.3d at 695 (quoting *Mancusi*, 392 U.S. at 367); *see also United States v. Brown*, 2023 WL 2569452, at *8 (W.D. Mo. Mar. 2, 2023) (collecting cases holding that criminal defendants do not have standing to challenge warrants because they impermissibly capture other individuals' cellular data). Wright's motion to suppress evidence obtained pursuant to the Tower Dump Warrants should be **DENIED**. Doc. 34, in part.[30]

### 3. *Wright's challenge to Warrants (k) and (m).*

Wright challenges Warrants (k) and (m), which authorized the search of information associated with various Google accounts and international mobile equipment identity ("IMEI") numbers. Doc. 191 at 2 n.1; doc. 46-21 (Warrant (k) issued November 20, 2019); doc. 46-23

---

[30] The District Court for the District of Columbia has noted that "whether a probable cause warrant is required under the Fourth Amendment for the government to obtain 'tower dumps,' [cit.], for short time periods in circumscribed locations where serious criminal conduct occurred, is murky at best, even though this investigative technique may be critical for prompt identification of a perpetrator." *Matter of Search of Info. Associated with Cellular Tel. Towers Providing Serv. to [Redacted] Stored at Premises Controlled by Verizon Wireless*, 616 F. Supp. 3d 1, 8 (D.D.C. 2022) (citation omitted). Given Wright's lack of standing, the Court need not determine whether the tower dump download required a warrant.

(Warrant (m) issued December 20, 2019).   Specifically, the warrant authorized the search of, *inter alia*, location data associated with the accounts, information associated with WiFi networks connected to devices associated with the accounts, "images, videos, or other files" with embedded location data created during specific time periods, and records containing subscriber information.  *See* doc. 46-21 at 41-42; doc. 46-23 at 41-42.  Each warrant lists at least fifteen accounts, *see* doc. 46-21 at 2; doc. 46-23 at 2; however, Wright clarified at the hearing that he only has standing to challenge the search of two of those accounts' data: the email address BARRYEEU@GMAIL.COM, and an account associated with an IMEI number ending in 4226.  Doc. 188 (Minute Entry).

Wright offers no specific argument regarding these two warrants in his initial motion or in his supplemental briefing.[31]   At the hearing, Wright argued that the affidavits supporting the warrants did not establish probable cause that evidence of the alleged crimes would be

---

[31] *See* doc. 34 at 6 (Wright challenges the two warrants at issue, and fourteen other warrants, by asserting "the government's warrants sought vast quantities of private information, far beyond what it could even arguably have probable cause to search or seize."); doc. 191 at 2 n.1 (Wright asserts in his supplemental brief that the two warrants "lack probable cause", but notes that the supplemental briefing does not add argument addressing those warrants).

found in the data associated with the email account and the 4226 IMEI

number.  Doc. 188 (Minute Entry).  The Court will address his arguments

regarding the email address and IMEI number separately.

The following is the entirety of Wright's argument regarding the

email address presented at the hearing:

> [T]here is no allegation in the affidavit linking the email
> address . . . to any criminal activity or [linking] it to any
> evidence that could be related to criminal activity. . . . And so,
> with respect to [the] email address, there is a lack of probable
> cause.

Doc. 188 (Minute Entry).  Wright's conclusory argument does not address

any of the specific categories of information sought in the affidavit, and

it is unclear why the affidavit would need to "link[ ] the email address . . .

[to] criminal activity" to support a warrant authorizing the search of, e.g.

*location data* associated with a device using the email address.  Even if

Wright had offered a specific argument regarding the affidavit's

purported deficiency, suppression would be inappropriate under *Leon*

because he has not even argued that any law enforcement conduct was

"deliberate enough [for the exclusionary rule] to yield meaningful

deterrence."  *Campbell*, 26 F.4th at 886-87 (quoting *Davis*, 564 U.S. at

240).  Wright's motion to suppress evidence obtained pursuant to this warrant should be **DENIED**.  Doc. 34, in part.

Next, the affidavits explain that the IMEI number ending in 4226 is associated with the phone number ending in 2822, *see* doc. 46-21 at 27-28, which is the subject of Wright's previously-discussed suppression motion at doc. 33.  At the hearing, Wright explained that his challenge to the search of data associated with the 4226 IMEI number mirrors his challenge to the warrant regarding the 2822 phone number: the affidavits assert that the phone associated with the 4226 IMEI number was located at EEU during the explosion, *see, e.g.*, doc. 46-21 at 27-28, so they do not establish probable cause that evidence of the alleged crimes would be found in the data associated with the number.  Doc. 188 (Minute Entry).  For the reasons discussed in the Court's rejection of this identical argument in support of doc. 33, Wright's request to suppress evidence obtained pursuant to these warrants should be **DENIED**.  Doc. 34, in part.

### 4. *Wright's challenge to Warrant (n).*

The final warrant challenged in Wright's suppression motion at doc. 34, as supplemented, doc. 191, is a warrant authorizing the search of data

associated with the phone number ending in 2822, doc. 46-24 at 2-5.  At the hearing, Wright adopted his briefing regarding his suppression motion at doc. 33 to support this challenge without adding additional argument.  Doc. 188 (Minute Entry).  For the reasons discussed in the Court's recommended denial of Wright's motion at doc. 33, his request to exclude evidence obtained pursuant to the warrant at doc. 46-24 should be **DENIED**.  Doc. 34, in part.

## IV.   Wright's Remaining Motions

The Court also took Wright's pending Motion for Discovery, doc. 13, and *Brady* Motion, doc. 99, under advisement at the hearing.  Doc. 188 (Minute Entry).  In his Motion for Discovery, Wright seeks an order requiring the Government to disclose four categories of discovery, as required by Federal Rule of Criminal Procedure 16.  Doc. 13 at 1-2 (seeking documents and tangible objects, Wright's statements, Wright's prior criminal record, and reports of examinations and tests).  The Government filed a response indicating that it "has provided, and will continue to provide, discovery subject to Rule 16."  Doc. 42 at 1.  Given

this representation, Wright's Motion for Discovery is **DISMISSED** as moot. Doc. 13.

Defendant's *Brady* Motion "requests that the Government produce any and all material exculpatory and impeaching evidence [sic] in the possession, custody or control of, or obtainable through due diligence by the Government" pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). Doc. 99 at 2. In response, the Government asserts that it has "complied with its obligations under [*Brady*], and will continue to do so." Doc. 101 at 1. Arguably that disclosure and the Government's recognition of its continuing duty render Wright's motion moot.

However, pursuant to the recently-enacted Due Process Protections Act, Pub. L. 116-182, 134 Stat. 894 (2020), and its revisions to Federal Rule of Criminal Procedure 5(f)(1), *id.* § 2, the Court is required, "on the first scheduled date when both prosecutor and defense counsel are present," to "confirm the disclosure obligation of the prosecutor under [*Brady*] and its progeny. . . ," *id.* An exhaustive presentation of the "possible consequence of violating [this Order] under applicable law," *id.*, is not feasible in this context. Beyond the obvious possibility of exposing the United States Attorney's Office to charges of prosecutorial

misconduct, *Brady* violations also portend serious consequences to the Government's case.   A prominent treatise summarizes the possible consequences as including, but not limited to, a new trial and, in particularly flagrant cases, dismissal.  *See* 2 Andrew D. Leopold, Federal Practice and Procedure § 256 (4th ed. 2023); *cf. United States v. Nejad*, 487 F. Supp. 3d 206, 225 (S.D.N.Y. 2020) (explaining, in a case involving serious misconduct by prosecutors, including withholding evidence, that "[t]he cost of such Government misconduct is high.  With each misstep the public faith in the criminal-justice system further erode.  With each document wrongfully withheld, an innocent person faces the chance of a wrongful conviction. And with each unforced Government error, the likelihood grows that a reviewing court will be forced to reverse a conviction or even dismiss an indictment, resulting in wasted resources, delayed justice, and individuals guilty of crimes potentially going unpunished.").

Although this case was arraigned before the Act took effect, *see* doc. 8 (Minute Entry), the principles established by *Brady*, and the consequences for ignoring those principles, remain the same. Additionally, after Wright's arraignment following the superseding

indictment, doc. 186 (Minute Entry), the Court's Scheduling and Discovery Order confirmed the Government's obligations under *Brady* and its progeny, and explained the consequences for the Government's failure to comply. *See* doc. 187 at 3 (citing Fed. R. Civ. P. 5(f)(1)). To the extent Wright requests another Order confirming the Government's obligations under *Brady*, his motion is **GRANTED**. Doc. 99.

## CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that all of Wright's pending suppression motions be **DENIED**. Docs. 27, 29, 30, 32, 33 & 34. Wright's Motion for Discovery is **DISMISSED** as moot, doc. 13, and his *Brady* Motion is **GRANTED** to the extent it seeks an Order confirming the Government's disclosure obligations, doc. 99.

This report and recommendation (R&R) is submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 72.3. Within 14 days of service, any party may file written objections to this R&R with the Court and serve a copy on all parties. The document should be captioned "Objections to Magistrate Judge's Report and Recommendations." Any request for additional time

to file objections should be filed with the Clerk for consideration by the assigned district judge.

After the objections period has ended, the Clerk shall submit this R&R together with any objections to the assigned district judge. The district judge will review the magistrate judge's findings and recommendation pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to timely file objections will result in the waiver of rights on appeal. 11th Cir. R. 3-1; *see Symonette v. V.A. Leasing Corp.*, 648 F. App'x 787, 790 (11th Cir. 2016); *Mitchell v. United States*, 612 F. App'x 542, 545 (11th Cir. 2015).

**SO ORDERED, REPORTED, AND RECOMMENDED**, this 25th day of May, 2023.

_____
CHRISTOPHER L. RAY
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA