# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF GEORGIA
# SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | CR419-149 |
| | ) | |
| BARRY WRIGHT, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER AND REPORT AND RECOMMENDATION

Defendant Barry Wright is charged with one count of using a weapon of mass destruction under 18 U.S.C. § 2332(a); one count of using a destructive device during and in relation to a crime of violence under 18 U.S.C. § 924(c); one count of using fire or an explosive to commit a felony offense under 18 U.S.C. § 844(h); and one count of possession of an unregistered destructive device under 26 U.S.C. § 5861(d). Doc. 175 (Superseding Indictment). A prior Report and Recommendation ("R&R") summarized relevant facts contained in several affidavits supporting search warrants in this case:

> Wright's ex-wife suffered severe injuries when the vehicle she was driving "suddenly exploded." Doc. 31-2 at 4.[ ] Investigators later found an incendiary device under the driver's seat. *Id.* It consisted of multiple circuit boards,

switches, wires batteries, plastic bottles, accelerant, and cardboard cylinders which tested positive for chemicals commonly found in boat flares. *Id.*

The affidavits state that Wright was an electrical engineer employed by an electrical equipment supplier specializing in switchgear, transformer, and engineering services. Doc. 31-2 at 5. The ex-wife's coworkers also told investigators that Wright was a "boat mechanic/repairman." *Id.* Her attorney indicated that the couple had a tumultuous divorce in which she was awarded a significant amount of money and the couple's home. *Id.* at 4. One of her co-workers noted that she had expressed concern that Wright was "involved" with a recent gas leak in her home. *Id.*

Doc. 100 at 2-3 (footnote omitted). Wright was arrested on state charges in connection with the explosion on July 10, 2019. Doc. 124-1 at 2. He was transferred to federal custody on August 28, 2019. 4:19-mj-00062, doc. 59 (Initial Appearance).

Currently before the Court are the parties' motions to exclude expert testimony. Wright seeks to exclude expert testimony from Lee Hoover, docs. 207 & 220; Juan Rosado-Marin, doc. 235; Stephen Shelley, doc. 205; and Gregg Mokrzycki, doc. 234. The Government opposes each of these motions. *See* doc. 215 (opposing exclusion of expert testimony by Lee Hoover); doc. 245 (opposing exclusion of expert testimony by Juan Rosado-Marin); doc. 213 (opposing exclusion of expert testimony by Stephen Shelley); doc. 244 (opposing exclusion of expert testimony by

2

Gregg Mokrzycki).  The Government seeks to exclude expert testimony from Frederic Whitehurst.  Doc. 268.  Wright opposes.  Doc. 273.

After all the pending motions to exclude expert testimony were fully briefed, *see generally* docket, the Court conducted a two-day *Daubert* hearing to evaluate the proposed expert testimony and hear arguments on the competing motions to exclude.  *See* doc. 285 (Minute Entry for proceedings on October 26, 2023); doc. 287 (Minute Entry for proceedings on October 27, 2023).  With the Court's permission, the parties filed additional briefing as to Lee Hoover following the hearing.  *See* doc 285 (Minute Entry); doc. 290; doc. 291.  The motions to exclude expert testimony were taken under advisement.  *See* doc. 289.  They are ripe for review.[1]

---

[1]  Generally, magistrate judges have the authority to resolve *Daubert* motions as nondispositive pretrial motions under 28 U.S.C. § 636(b)(1)(A).  *See Stewart v. Johnson*, 2021 WL 6752312, at *1 (S.D. Ga. Aug. 10, 2021) ("Plaintiff's motion to exclude [expert testimony] was plainly a non-dispositive pretrial evidentiary motion."); *Rodriguez v. GEICO Gen. Ins. Co.*, 2021 WL 1053156, at *1 n.2 (M.D. Fla. Feb. 4, 2021) ("A *Daubert* motion is not a dispositive motion.").  However, the undersigned recognizes that a magistrate judge's authority to rule on nondispositive pretrial evidentiary motions in *criminal* cases may be limited in comparison to his authority to rule on nondispositive pretrial evidentiary motions *civil* cases.  For example, § 636(b)(1)(A) specifies that a magistrate judge does not have the authority determine a motion to suppress evidence in a criminal case.  As with motions to suppress, *Daubert* motions directly impact what evidence may be presented at trial. Though § 636(b)(1)(A) does not explicitly preclude a magistrate judge from ruling on *Daubert* motions in criminal cases, courts in this circuit generally proceed on R&R when handling such motions in the criminal context.  *See e.g., United States v.*

## I.   LEGAL STANDARD

Federal Rule of Evidence 702 requires the Court to perform a "gatekeeping" function concerning the admissibility of expert evidence. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 n.7, 597 (1993)). In performing this task, the Court must consider whether the party offering the evidence has shown:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Frazier*, 387 F.3d at 1260 (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir.1998)).  The proponent of the expert

---

*Jackson*, 2018 WL 3387461 (N.D. Ga. July 12, 2018); *United States v. Barton*, 2019 WL 6324536 (M.D. Fla. Nov. 26, 2019); *United States v. Alvin*, 2024 WL 149288 (S.D. Fla. Jan. 5, 2024). *Cf. United States v. Diaz*, 2008 WL 906725 (S.D. Fla. Mar. 28, 2008) (magistrate judge's order denying motion to exclude expert testimony).  *Daubert* motions in criminal cases are rare in this district, but on at least one occasion, the Court has handled a *Daubert* motion in a criminal case on R&R.  *See United States v. Quinones*, 2012 WL 2064705 (S.D. Ga. May 22, 2012) (addressing a motion to suppress, motion to dismiss the indictment, and *Daubert* motion through a single R&R).  Out of an abundance of caution, the undersigned submits this recommendation to the District Judge pursuant to 28 U.S.C. § 636(b)(1)(B) considering the impact of the recommended disposition on the evidence that may be presented at trial in this criminal case.

opinion bears the burden of establishing qualification, reliability, and helpfulness by a preponderance of the evidence. *Daubert*, 509 U.S. at 592, 592 n.10.

Under the first prong, "experts may be qualified in various ways. While scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status." *Frazier*, 387 F.3d at 1260-61; *see also* Fed. R. Evid. 702 (a witness may be qualified as an expert by "knowledge, skill, experience, training, or education[.]").   But, "[w]hen an expert witness relies mainly on experience to show he is qualified to testify, 'the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" *Payne v. C.R. Bard, Inc.*, 606 F. App'x 940, 942-43 (11th Cir. 2015) (quoting *Frazier*, 387 F.3d at 1261).

As to the second prong, the reliability "criterion remains a discrete, independent, and important requirement for admissibility." *Frazier*, 387 F.3d at 1261.  "The Supreme Court in *Daubert* set out a list of 'general observations' for determining whether expert testimony is sufficiently reliable to be admitted under Rule 702." *United States v. Brown*, 415

F.3d 1257, 1267 (11th Cir. 2005) (citation omitted).  These factors, or observations, inquire into the expert's "theory or technique" and are: "(1) whether it can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) what its known or potential rate of error is, and whether standards controlling its operation exist; and (4) whether it is generally accepted in the field."  *Id.* (citation omitted).  "Sometimes the specific *Daubert* factors will aid in determining reliability; sometimes other questions may be more useful." *Frazier*, 387 F.3d at 1262.

Expert testimony must also assist the trier of fact.  *Frazier*, 387 F.3d at 1262.  "By this requirement, expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person."  *Id.* (citation omitted).  This inquiry is commonly called the "helpfulness" inquiry.  *Prosper v. Martin*, 989 F.3d 1242, 1249 (11th Cir. 2021) (citing *Frazier*, 387 F.3d at 1260).  "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* (quoting *Daubert*, 509 U.S. at 591).  Additionally, experts "may not testify to the legal implications of conduct" or "tell the jury what result to reach." *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th

Cir. 1990). Such testimony is considered unhelpful because it "in no way assists the trier of fact." *Cooper v. Pacific Life Ins. Co.*, 2007 WL 430730, at *1 (S.D. Ga. Feb. 6, 2007).

## II.   ANALYSIS

### A. Lee Hoover

Wright seeks to exclude expert testimony from Lee Hoover, a Senior Special Agent and Certified Fire Investigator with the Bureau of Alcohol, Tabaco, Firearms and Explosives ("ATF"). Doc. 220.[2] The Government offers Hoover "as an expert witness in the field of fire analysis to render an expert cause and origin opinion." Doc. 291 at 1. Wright argues that Hoover's expert testimony should be excluded for two reasons. First, he argues that the Government's expert disclosure, doc. 171, does not comply with Rule 16 of the Federal Rules of Criminal Procedure. *See* doc. 220 at 4-5. Second, he argues that Hoover's testimony is inadmissible

---

[2] Wright filed an initial Motion to Exclude Expert Testimony of ATF Special Agent Lee Hoover in April 2023. Doc. 207. He subsequently filed the Superseding Motion to Exclude Expert Testimony of ATF Agent Lee Hoover now before the Court. Doc. 220. The original motion to exclude Hoover's expert testimony is **DISMISSED as moot**. Doc. 207.

under *Daubert*. *See id.* at 5-10; doc. 290. The Court addresses each of these arguments in turn.

### a. Rule 16 Challenge

Wright argues that the Government's expert disclosure of Agent Hoover, doc. 171, was insufficient under Federal Rule of Criminal Procedure 16(a)(1)(G) and her expert testimony should therefore be excluded. Doc. 220 at 4-5. Rule 16 provides that the disclosure of expert witnesses must contain "a complete statement of all opinions that the government will elicit from the witness in its case-in-chief" and "the bases and reasons for them." Fed. R .Crim. P. 16(a)(1)(G)(iii). Wright objects to the Government summarily directing him to Hoover's investigative report for her "opinions and the bases and reasons therefor," doc. 171 at 2, instead of providing a complete statement of all the opinions that the Government intends to elicit from Hoover at trial as required by Rule 16. Doc. 220 at 4. Wright further asserts that the bases and reasons for Hoover's opinions do not appear in the report, despite the Government's reliance on that document in its disclosure. *Id.* Because the bases of and reasons for Hoover's opinions were not disclosed, Wright argues, "those

opinions should be excluded." *Id.* at 5.  The Government did not respond to Wright's Rule 16 arguments.  *See generally* docket.

As an initial matter, the Government is permitted to "refer[] to, rather than repeat[]" information previously disclosed in a report provided to a defendant under Rule 16(a)(1)(F) in its expert disclosure. *See* Fed. R. Crim. P. 16(a)(1)(G)(iv).  Directing Wright to Hoover's report for her opinions and the bases and reasons therefor, *see* doc. 171 at 2, rather than repeating them, did not violate Rule 16.  *See also* Fed. R. Civ. P. 16 advisory committee's notes to the 2022 amendments ("Information previously provided need not be repeated in the expert disclosure, if the expert disclosure clearly identifies the information and the prior report in which it was provided."); doc. 171 at 1-2 ("Special Agent Hoover's opinions and the bases and reasons therefor[] are specifically addressed in Special Agent Hoover's August 13, 2020 report in ATF investigation

number 760540-19-0113, report number 80, which was previously produced in discovery.").

However, Rule 16(a)(1)(G) was recently amended[3] to address a "shortcoming" of earlier versions of the expert disclosure requirement: "the lack of adequate specificity regarding what information must be disclosed." *See* Fed. R. Civ. P. 16 advisory committee's notes to the 2022 amendments. The change was intended to "facilitate trial preparation" by "allowing the parties a fair opportunity to prepare to cross-examine expert witnesses and secure opposing expert testimony if needed. *Id.* Now, rather than provide a "written summary" of the expert's opinions, the parties must "provide 'a *complete statement*' of the witness's opinions, *the bases and reasons for those opinions*, the witness's qualifications, and

---

[3] The 2022 Amendments to the Federal Rules of Criminal Procedure went into effect on December 1, 2022. *See* Proposed Amendments to the Federal Rules of Criminal Procedure, 340 F.R.D. 810 (Apr. 11, 2022). The new Rule 16(a)(1)(G) governs "in all proceedings then pending" "insofar as just and practicable." *Id.* The Government "does not concede that the new Rule 16(a)(1)(G) . . . applies to cases already charged as of its promulgation," but did not provide any support for its position or explain why this Court should disregard the Supreme Court's clear order to the contrary. Doc. 169 at 3; *see also* 340 F.R.D. 810. Given that the Government filed its expert disclosures *after* December 1, 2022, *see generally* docs. 171 & 172, the Court "can see no reason not to apply the new rule." *See United States v. Gonzalez*, 834 F.3d 1206, 1218 (11th Cir. 2016).

a list of other cases in which the witness has testified in the past 4 years." *Id.* (emphasis added).

Hoover's investigative report explains that she relied "on the information available" and "conduct[ed] a systematic fire scene investigation, inspect[ed] the physical evidence and consider[ed] witness observations" to reach an opinion as to the cause of the fire. *See* doc. 207-4 at 20. The report also states that she relied on the National Fire Protection Agency's Guide for Fire and Explosion Investigations ("NFPA 921") in conducting her investigation. *Id.* at 9, 20. But neither Hoover's report nor the Government's Rule 16 disclosure explicitly include her training and experience as bases or reasons for her opinions. *See generally id.*; *see also* doc. 171 at 1-2. Her testimony at the *Daubert* hearing, however, clearly indicated that she relied on her training and experience to reach the proffered expert opinions. Because the Government did not disclose that Hoover's training and experience provided bases or reasons for her opinions, its disclosure is insufficient under Rule 16(a)(1)(G)(iii).

In determining appropriate sanctions for a violation of discovery rules, courts must consider: (1) the reasons for the government's

violation; (2) the extent of the prejudice, if any, the defendant has suffered because of the violation; (3) the feasibility of curing such prejudice with sanctions; and (4) whether the prosecution acted in bad faith. *See United States v. Fernandez*, 780 F.2d 1573, 1576 (11th Cir. 1986); *United States v. Turner*, 871 F.2d 1574, 1580 (11th Cir. 1989). Furthermore, courts "should impose the least severe sanction that will accomplish the desired result–prompt and full compliance with" the governing discovery rules. *United States v. Sarcinelli*, 667 F.2d 5, 7 (5th Cir., Unit B, 1982) (Tjoflat, J.).[4]

The Government offers no justification for its omission. As mentioned above, the Government does not engage with Wright's Rule 16 arguments at all. *See* doc. 215; *see generally* docket. Failing to address the alleged failure to comply with Rule 16 weighs against the Government. However, the prosecution's actions here seem more neglectful than willful. While the Court cannot endorse the adequacy of

---

[4]  The decisions of the former Fifth Circuit rendered before October 1, 1981, are binding on the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc). After that date, only the decisions of the continuing Fifth Circuit's Administrative Unit B are binding. *Stein v. Reynolds Sec., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982).

the Government's disclosure, it does not find, at this stage, that the United States' insufficient Rule 16 disclosure was made in bad faith.[5]

Though he acknowledges the Eleventh Circuit's standard for determining appropriate Rule 16(d) sanctions, Wright's motion to exclude Hoover as an expert is based solely on the Government's technical noncompliance with the Rule 16's requirements, not on any harm that noncompliance has caused him. *See* doc. 220 at 4-5. He does not claim to be prejudiced by the insufficient disclosure. He does not allege that not knowing that Hoover based her opinions on her training and experience in any way impeded his "trial preparation." *See* Fed. R. Civ. P. 16 advisory committee's notes to the 2022 amendments. Wright also offers nothing to show that excluding Hoover is the least severe sanction available to the Court to meaningfully cure any unnamed prejudice caused by the insufficient disclosure. Under the circumstances, then, excluding Hoover as an expert is too severe a sanction. *See Sarcinelli*, 667 F.2d at 7. Wright's request to exclude her testimony on this basis should, therefore, be **DENIED**.

---

[5] The Government will have to file Rule 16 compliant disclosures for Hoover and Shelley. *See infra.* Should its future expert disclosures fail to meet Rule 16's requirements–despite clear direction from the Court–the Court will infer bad faith on the Government's part.

Though Wright's requested relief is too extreme under the circumstances, the fact remains that the Government's Rule 16 expert disclosure was insufficient.   The Court therefore **DIRECTS** the Government to submit a renewed expert disclosure for Hoover that complies with all of Rule 16's requirements within 14 days of the issuance of this Order.   *See* Fed. R. Crim. P. 16(d)(2)(A).   If the Government's renewed disclosure fails to satisfy Rule 16, Wright may challenge the disclosure and move for appropriate sanctions–based on the Eleventh Circuit's framework for evaluating Rule 16(d) sanctions–within 7 days of the renewed disclosure's filing.   The Government will have 7 days to respond to any motion for sanctions.

### b. *Daubert* Challenge

Wright further argues that Hoover's testimony should be excluded under *Daubert*.  Doc. 220 at 5-10; doc. 290 at 1-2.  Specifically, he argues that Hoover is not qualified to testify as to the opinions contained in her report, her opinions and conclusions are not reliable, and her opinions would not be helpful to the trier of fact.  Doc. 220 at 5-10.  *See also Frazier*, 387 F.3d at 1260.  None of those arguments prevails.

First, Wright contends that Hoover is not qualified to offer the following opinions contained in her report: (1) the fire originated under the driver's seat of the Ford Flex; (2) the fire was caused by an improvised explosive device, positioned under the driver's seat; (3) the device ruptured the water bottles, ignited the gas vapors contained in the water bottles, causing the fire to spread rapidly in the passenger compartment; (4) the fire was "incendiary"; and (5) the victim's injuries were caused by the car fire.  *See* doc. 220 at 7-8; doc. 290.  Wright correctly observes that when an expert "'witness is relying . . . primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'"  *Frazier*, 387 F.3d at 1261 (quoting Fed R. Evid. 702 advisory committee's notes to the 2000 amendments); doc. 220 at 7-8.  However, the Government suggests that Hoover may be qualified as an expert based not solely on her experience, but on her education and training.  *See* Fed. R. Evid. 702 ("A witness [can be] qualified as an expert by knowledge, skill, experience, training, or education[.]").  The Government offers that

> [i]n 2002, Special Agent Hoover graduated from the Federal
> Law Enforcement Training Center and the ATF National

Academy.  Special Agent Hoover received extensive training in conduc[t]ing fire and explosive investigations, and those matters involving explosive materials, destructive devices, and arson.  In 2014, Special Agent Hoover received additional training in complex arson investigation from ATF's National Center for Explosive Research.   In 2015, she completed advanced origin and cause courtroom testimony training . . . at the National Fire Academy.  Also in 2016, Special Agent Hoover received training in the electrical aspects of fire investigation at the National Fire Academy.  In 2017, Special Agent Hoover completed advanced origin and cause courtroom testimony training at ATF's National Center for Explosive Research.   Also in 2017, Special Agent Hoover completed 110 hours of online training for fire investigators from the International Association of Arson Investigators.  In 2018, Special Agent Hoover received additional training concerning enclosure fire dynamics at ATF's Fire Research Laboratory.  Between 2016 and 2018, Special Agent Hoover completed ATF's Certified Fire Investigator Candidate Program.

Doc. 215 at 2-3; *see also* doc. 207-3 at 4-5 (Hoover CV).  Additionally, Hoover earned her Master of Forensic Science from Oklahoma State University in 2021.  Doc. 207-3 at 4.  The Court finds that she is qualified to opine as to the cause and origin of the fire based on her education and training.   There is no dispute that the first four opinions Wright challenges relate to the cause and origin of the fire.  *See* doc. 220 at 7-8.

Concerning Wright's objection to Hoover's opinion that the victim's injuries "were caused by the car fire," doc. 290 at 1, it is not clear that is actually the opinion Hoover intends to offer.  It appears that Hoover will

16

testify that the victim's injuries were "consistent with a rapidly progressing fire that started under the driver's seat consistent with the ignitable liquid that was expelled out from underneath the seat onto her exposed extremities."  Doc. 207-4 at 18.  The NFPA 921, the industry standard guide for fire investigators, "recommends that fire investigators consider burn injuries as part of their analysis."  Doc. 291 at 2.  Hoover considered photographs of the victim's burns and burned clothing in conjunction with other physical evidence found at the scene to conclude that the fire originated under the driver's seat and was caused by a device that rapidly expelled ignitable liquid.  *See* doc. 207-4 at 18.  This is an opinion as to the cause and origin of the fire, which Hoover is qualified to give, rather than an opinion about the cause of the victim's injuries.  In post-hearing briefing, the Government effectively abandoned any argument that Hoover could offer expert testimony concerning causation of the victim's injuries.  Doc. 291 at 1 ("The United States is not seeking to quali[f]y Special Agent Hoover as a medical expert.  Rather, the United States is seeking to offer Special Agent Hoover as an expert witness in the field of fire analysis to render an expert cause an origin opinion.").

As the Government appears to concede, Hoover cannot offer any testimony at trial regarding causation of the victim's injuries.

Second, Wright challenges the reliability of Hoover's testimony. Wright argues that Hoover's opinions are unreliable because "[t]here is no evidence that Hoover's opinions and conclusions have been peer reviewed, are subject to a known error rate, or whether they have been tested." Doc. 220 at 9. As an initial matter, it is an expert's methodology–not their final opinion–that is evaluated for reliability. *See Daubert*, 509 U.S. at 595 ("The focus" of a *Daubert* inquiry "must be solely on *principles and methodology*, not on the conclusions that they generate.") (emphasis added). The Court therefore construes Wright's challenge to the reliability of Hoover's *opinions* as a challenge to the reliability of her *methodology*.

Even then, the three reliability factors Wright points to are not exhaustive. *See United Fire and Cas. Co. v. Whirlpool Corp.*, 704 F.3d 1338, 1341 (11th Cir. 2013) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1997)) (noting that the Supreme Court "has emphasized that these factors are not exhaustive and are intended to be applied in a 'flexible' manner."). The Court must also consider whether

an expert's technique has been generally accepted in the relevant scientific community, as well as any other factors that touch on the "overarching subject [of] scientific validity." *See Daubert*, 509 U.S. at 593-95.

In conducting her investigation, Hoover relied on the NFPA 921, "a peer reviewed fire investigation guide that is the industry standard for fire investigators." *United Fire and Cas. Co.*, 704 F.3d at 1341. *See also* doc. 207-4 at 9, 20. She used the scientific method when examining the scene, ruling out alternative possible causes of the fire, and in reaching her ultimate opinion. In her report and at the *Daubert* hearing, she pointed to specific pieces of physical evidence to support her conclusions. *See generally* doc. 207-4. While not formally peer-reviewed, her findings were discussed with, reviewed, and approved by co-workers. The Court finds that Hoover's methodology is reliable. *See United Fire and Cas. Co.*, 704 F.3d at 1341-42 (finding that a fire origin expert's "testimony regarding the physical origin of the fire was based on widely accepted methodology" when the expert examined the scene in accordance with the NFPA 921 and pointed to specific physical evidence to support his conclusion); *United States v. Santiago*, 202 F. App'x 399, 401 (11th Cir.

2006) (holding that the district court was within its discretion in finding that a fire cause and origin expert's investigative methods "were of the kind reasonably relied upon by experts in the field of fire investigation" when the investigator had "systematically examined the scene and used the scientific method to identify the fire's origin" and his "findings were subject to review by his co-workers and supervisors").

Third, to challenge Hoover's testimony's helpfulness, Wright argues that "Hoover's conclusions are an effort to package unscientific opinions under the guise of expertise." Doc. 220 at 10.   He immediately follows that assertion with a conclusory statement that her testimony would not assist the trier of fact.   *Id.*   Wright seems to be suggesting that because Hoover's conclusions are "unscientific"–or unreliable–they are not helpful.   The Court rejects this argument for two reasons.   First, "reliability[] and helpfulness . . . remain distinct concepts and the courts must take care not to conflate them." *Frazier*, 387 F.3d at 1260.   Second, as articulated above, the methodology underlying Hoover's opinions *is* scientific and reliable.

For the foregoing reasons, Wright's arguments that Hoover should be excluded under *Daubert* fail.   His Superseding Motion to Exclude

Expert Testimony of ATF Special Agent Lee Hoover should therefore be **DENIED**.  Doc. 220.

      B. <u>Juan Rosado-Marin</u>

Wright also challenges several opinions from Juan Rosado-Marin, a former electrical engineer with ATF who the Government offers "as an expert witness in the field of electrical systems and engineering," doc. 171 at 5.  Doc. 235.  Rosado-Marin received several pieces of evidence from the investigation to examine, including Exhibit 13–"[c]arpet containing cardboard tube, wires, circuit board, switches"–and Exhibit 14–"[c]ircuit board with batteries attached by wire and tape."  Doc. 235-1 at 2.  These exhibits are part of the "device" at issue in this case.  *See generally* doc. 287-3 at 16-17 (Gov. Ex. 14) (marking Exhibits 13 and 14 as "Explosives/Bomb").  Wright challenges four opinions disclosed in Rosado-Marin's November 12, 2019 report regarding Exhibit 14: (1) the batteries were consistent with Milwaukee brand tools; (2) the cables with quick connectors used on the circuit board connections were consistent with the Hopkins # 47965 exemplar cable; (3) the circuit board was consistent with the GSM-AUTO module; and (4) an incoming string of

SMS messages could have energized the associated conductors.[6] Doc. 235 at 6; *see also* doc. 235-1 at 5 (November 12, 2019 report).  Wright argues that the first three opinions are not reliable and will not assist the trier of fact.  Doc. 235 at 6-8.  He challenges Rosado-Marin's qualifications to testify as to the fourth opinion, argues that it is unreliable, and suggests that under Rule 401 of the Federal Rules of Evidence, the opinion is insufficient to establish relevancy.  *Id.* at 8-9.

Turning to the first three opinions, Wright argues those conclusions are not reliable because "[t]here is nothing in Rosado-Marin's report that would suggest that his conclusions have been peer reviewed, are subject to a known error rate, or whether they have been tested."  Doc. 235 at 7.  Again, the Court construes Wright's challenge to the reliability of Rosado-Marin's conclusions as a challenge to the reliability of his methodology.  *Daubert*, 509 U.S. at 595 ("The focus" of a *Daubert* inquiry "must be solely on *principles and methodology*, not on the conclusions that they generate.") (emphasis added).

---

[6] Wright does not challenge Rosado-Marin's March 6, 2020 report, doc. 235-2.  Doc. 235 at 4.

However, objecting to a lack of peer review, known error rate, and testing makes little sense given how Rosado-Marin reached his first three opinions. Whether the *Daubert* factors are relevant to "assessing reliability in a given case will depend on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Brown*, 415 F.3d at 1267 (internal citation, quotations, and alteration omitted). Here, Rosado-Marin did a visual comparison between the evidence he received and exemplar components to conclude that the batteries were consistent with Milwaukee brand tools, the cables with quick connectors used on the circuit board connections were consistent with the Hopkins # 47965 exemplar cable, and the circuit board was consistent with the GSM-AUTO module. *See* doc. 235-1 at 4-5. Peer review, error rate, or testing are not applicable to visual comparison.

Yet visual comparison is not an inherently unreliable methodology. When using visual comparisons is generally accepted in expert's field, a visual comparison combined with the expert's knowledge may be sufficiently reliable. *See Brown*, 415 F.3d at 1267-68 (holding that the trial court did not abuse its discretion in allowing two chemistry experts to testify that the chemical structures of two substances were

23

substantially similar based on a visual comparison of the structures and their expert knowledge of chemistry). At the *Daubert* hearing, Rosado-Marin testified that investigators routinely create exemplars based on data gathered during the investigation–including "data" gathered by visual observation–to form an opinion about how an electronic device was constructed. He explained that it was common practice to get exemplar parts and compare them side by side with the evidence to determine if the pieces were consistent. As to his conclusions here, Rosado-Marin identified specific characteristics of each piece of evidence that led him to conclude that his exemplar was consistent with what was found at the scene. For example, markings on the circuit board found in Exhibit 14 allowed him to identify the manufacturer of the board. He noted that the color and terminal layout of the battery in Exhibit 14 was consistent with the color and terminal layout of Milwaukee batteries. For the cables, he, among other things, measured the thickness of the internal wiring and found that was consistent between the cables in Exhibit 14 and a Hopkins #47965 cable. In other words–Rosado-Marin used visual comparison in connection with his expert knowledge of electronics and electrical

systems to reach these opinions.  His report was reviewed and ratified by other experts in the lab.  *See* doc. 235-1 at 6.

The Court finds Rosado-Marin's visual comparison reliable.  This conclusion is consistent with the "liberal thrust of the Federal Rules and their general approach of relaxing the traditional barriers to opinion testimony."  *Daubert*, 509 U.S. at 588 (internal quotations omitted).  To the extent Wright believes there are "weaknesses in the underpinnings of the opinion[s]," those weaknesses "go to the weight and not the admissibility of the testimony."  *Jones v. Otis Elevator Co.*, 861 F.2d 655, 663 (11th Cir. 1988).  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 596.

Wright also argues that the first three opinions will not assist the trier of fact because the opinions are observations a jury could make.  Doc. 235 at 7.  He relies on *Jackson v. Catanzariti*, wherein an expert was prohibited from offering "unexplained interpretations of video evidence that the jury itself [was] fully capable of reviewing."  2019 WL 2098991, at *10 (S.D. Ga. May 14, 2019) (Baker, J.).  The expert's "conclusory

observations" about the video were unhelpful because they did not "explain[] something 'beyond the understanding and experience of the average citizen.'" *Id.* (quoting *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985)).

Here, Rosado-Marin *does* explain something beyond an average citizen's understanding and experience. Though his opinions are based on visual observations, as the expert's opinions in *Jackson* were, "technical[] or other specialized knowledge" was necessary to make the comparisons between the evidence and the exemplars. *See* Fed. R. Evid. 702(a). For example, in addition to comparing the color and shape of the battery pack in Exhibit 14 and the Milwaukee brand battery used in his exemplar, Rosado-Marin also considered the "cells arrangement and battery contact layout." *See* doc. 235-1 at 4. When comparing the extension cables to the Hopkins #47965 2-Pole Flat Extension Cable he used in the exemplar, he noted the similar "metal connector shapes [and] quantity of the co[p]per conductor strands and their diameter." *Id.* To compare the exemplar circuit board with the one found at the scene, he considered the "electronic component layout, circuit board model and circuit board communication markings." *Id.*

A jury could observe that two objects have similar colors and shapes without expert assistance.  But the challenged opinions go beyond simple "eyeball comparisons."  *See* doc. 250 at 3.  Recognizing specific, technical characteristics of electronic components and identifying them as both significant and similar requires "something 'beyond the understanding and experience of the average citizen.'"  *Jackson*, 2019 WL 2098991, at *10 (quoting *Rouco*, 765 F.2d at 995).  Rosado-Marin's opinions are more than "conclusory observations" and will assist the trier of fact.  *Id.*

As to Rosado-Marin's fourth opinion "that an incoming string of SMS messages 'could have' energized the associated conductors," Wright first argues that Rosado-Marin is not qualified to offer this opinion because nothing in his report "explains the bases for his opinions, how his experience leads to the conclusions reached, why that experience is a sufficient basis for the opinion, or how that experience is reliably applied."  Doc. 235 at 8.  But such explanations are only necessary when an expert is relying solely or primarily on his experience to form his opinions.  *See Frazier*, 387 F.3d at 1261.  The Government argues that Rosado-Marin's education and training qualify him to offer this opinion.  *See* doc. 245 at 3.  Rosado-Marin has a bachelor's degree in Electronics

Engineering Technology with a focus of study on electronic circuits, instrumentation, and industrial systems.[7]   Doc. 245-1 at 6.   The challenged opinion–that an incoming string of SMS messages could have energized the associated conductors–concerns electronic circuits.   *See* doc. 235-1 at 4-5.   Furthermore, during his time with ATF, he attended a number of trainings centered on electrical systems and fire investigations, including a 5 day course at the National Fire Academy in June 2019 titled "Fire Investigation: Electrical Systems."   *See* doc. 245-1 at 8.   The Court finds that Rosado-Marin is qualified to opine on how the device found in this case may have functioned.

Wright also asserts a general reliability challenge to the opinion regarding how incoming SMS messages may have completed the circuit, arguing that Rosado-Marin's report does not establish any of the four reliability factors articulated by the Supreme Court in *Daubert*.   Doc. 235 at 8.   At the *Daubert* hearing, Rosado-Marin testified that the ATF Fire Investigation Lab uses the scientific method when conducting electrical examinations in fire investigations and that he used the scientific method

---

[7]  Rosado-Marin earned his degree in May 2017–before conducting his investigation in this case.   Doc. 245-1 at 6.

when he examined the evidence sent to him in this specific case. The ATF Fire Investigative Lab, which is accredited by the American Society of Crime Laboratory Directors, also has its own internal procedures that Rosado-Marin followed. *See* doc. 245 at 9. His report was subject to review by other experts in the lab to ensure the final report was scientific and compatible with the data. Additionally, while testifying, Rosado-Marin twice referenced the NFPA 921, "a peer reviewed fire investigation guide that is the industry standard for fire investigation." *United Fire and Cas. Co.*, 704 F.3d at 1341.

There is nothing inherently unreliable about the methodology Rosado-Marin used to reach this opinion. Generally speaking, he used the scientific method, referenced the NFPA 921, followed the ATF Fire Investigative Lab's internal procedures, and his conclusions were subject to review by other electrical experts in the lab. *Cf. Santiago*, 202 F. App'x at 401 (holding that a fire cause and origin expert's investigative methods "were of the kind reasonably relied upon by experts in the field of fire investigation" when the investigator had "systematically examined the scene and used the scientific method to identify the fire's origin and to rule out any accidents" and his "findings were subject to review by his co-

workers and supervisors"). Specific to the challenged opinion, he testified he developed his theory regarding the SMS messages after researching the circuit board, examining the SIM card on the board, and using the scientific method to rule out electrical failure in the components of the device before concluding that "the incoming command string of the SMS message energized the relay the relay #1 coil, closing the contract between terminals "NO1" and "COM" and could have energized the associated conductors to these terminals at the time of the incoming SMS messages."  Doc. 235-1 at 5.  His peers at the ATF lab reviewed and ratified this conclusion.  The Court finds his methodology reliable.

Again, if Wright believes there are "weaknesses in the underpinnings of the opinion," those weaknesses "go to the weight and not the admissibility of the testimony."  *Jones*, 861 F.2d at 663.  Wright may address his concerns at trial through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof."  *Daubert*, 509 U.S. at 596.

Finally, Wright argues that "Rosado-Marin's conclusion that the SMS messages *could have* energized the conductors[] does not make any fact more probable, and should be excluded" as irrelevant under Federal

Rules of Evidence 401 and 402.  Doc. 235 at 9 (emphasis added).  The Court is unpersuaded.  Absolute certainty on causation is not required. *See Jones*, 861 F.2d at 662 ("[A]bsolute certainty is not required.  Expert testimony is admissible which connects conditions existing later to those existing earlier provided the connection is concluded logically."); *see also Diaz v. Carnival Corp.*, 544 F. Supp. 3d 1352, 1358 (S.D. Fla. 2021) ("[A]bsolute certainty on causation is not required.").  That the opinion does not convey absolute certainty is something Wright can explore on cross-examination.  *See Jones*, 861 F.2d at 663.  But in light of the charges against Wright, Rosado-Marin's conclusion that the conductors could have been charged by SMS messages is relevant and admissible.

For the foregoing reasons, Wright's arguments that *Daubert* and the Federal Rules of Evidence preclude Rosado-Marin from offering certain opinions fail.  Rosado-Marin may testify that: (1) the batteries in Exhibit 14 were consist with Milwaukee brand tools; (2) the cables with quick connectors used on the circuit board connections were consistent with the Hopkins # 47965 exemplar cable; (3) the GSM-AUTO module was consistent with the circuit board in Exhibit 14; and (4) an incoming string of SMS messages could have energized the associated conductors.

*See* doc. 235 at 6; *see also* doc. 235-1 at 5.  Wright's Motion to Exclude Expert Testimony of Juan Rosado-Marin should be **DENIED**.  Doc. 235.

      C. <u>Stephen Shelley</u>

Wright seeks to exclude expert testimony from Stephen Shelley, a Senior Explosives Enforcement Officer with ATF who the government offers "as an expert witness in the field of explosive and destructive device determinations," doc. 171 at 8.  Doc. 205.  Wright objects to Shelley's opinion that "the remains of an incinerated item found in the victim's car . . . was a 'destructive device' and a 'weapon of mass destruction' as defined by specific federal criminal statutes" on two grounds.  Doc. 205 at 1.  First, Wright challenges the sufficiency of Shelley's report–which the Government relies on in its expert disclosure, *see* doc. 171 at 9–to establish Shelley's qualifications or the reliability of his methodology.  Doc. 205 at 1-3.  Second, Wright argues that the opinion both tells the jury what result to reach and constitutes a legal conclusion and should therefore be excluded as unhelpful.  *Id.* at 3-5.

To address Wright's concerns about the sufficiency of Shelley's report, the Government attempted to supplement its initial disclosure in its response–after the deadline for expert disclosures passed.  *See* doc.

213 at 2-5 (filed April 17, 2023); doc. 201 at 1 (affirming a March 20, 2023

deadline for Government's expert disclosures).  Wright contends that the

Government's supplemental disclosure "does not comply with Federal

Rule of Criminal Procedure 16(a)(1)(G)(iii) and (v), in that it fails to

include any bases or reasons for any of Officer Shelley's expert opinions .

. . and also fails to include the approval and signature of the expert."  Doc.

217 at 7.  He therefore moves to strike the supplemental disclosure as

insufficient under Rule 16.  *Id.*  The Court will address Wright's motion

to strike before turning to the substance of his *Daubert* motion.

### a. Rule 16 Challenge

The Government asserted in its expert disclosure for Shelly that

"the bases and reasons" for his opinions were in his report.  Doc. 171 at

9.  But Shelley's report provides *no* bases or reasons for his opinion.  *See*

doc. 205-1 at 2-3.  The Government's expert disclosure for Shelley was

therefore deficient under Rule 16(a)(1)(G)(iii).  While Wright complained

about the utter lack of information regarding Shelley's methodology in

his motion to exclude, he did not challenge the sufficiency of the

disclosure; instead, his motion to exclude Shelley is based solely on

*Daubert* and Rule 702 of the Federal Rules of Evidence.  *See* doc. 205 at

1-3.  Wright did not raise a Rule 16 issue until after the Government's out-of-time supplemental disclosure.  *See* doc. 217 at 7.

The Government moved to supplement its disclosure for Shelley almost a month after the deadline to file expert disclosures.  *See* doc. 201 at 1; doc. 213.  It did not acknowledge that its deadline for expert disclosures had passed, nor did it provide support for its position that the Court should allow it to supplement the disclosure beyond asserting that Wright would not be prejudiced.  Doc. 213 at 1-5.  It also did not offer any explanation as to why the initial disclosure for Shelley did not include the information contained in the supplemental disclosure.  *See id.*  The Government even admits that it did not bother to seek out the additional information–information necessary to satisfy Rule 16's requirements–until *after* Wright challenged Shelley on April 3, 2023.  *Id.* at 2 ("In response to Defendant's argument . . . the United States sought additional detailed information from Officer Shelley concerning his examination and opinion."); *see generally* doc. 205.  While the Government has an ongoing duty to supplement and correct its disclosures when it "discovers additional evidence or material," *see* Fed R. Crim. P. 16(a)(1)(G)(vi), (c), the Government cannot be said to have

"discovered" information which it could have–and indeed should have–obtained and disclosed in the first instance.  The Government's showing in support of its motion to supplement is thin.

But the Court can resolve the overarching issue of the Government's insufficient disclosure and motion to supplement by resolving Wright's motion to strike the supplement.  Wright argues that the supplemental disclosure is insufficient because it does not state the bases and reasons for Shelley's opinion and is not signed.  *See* doc. 217 at 7.  The supplemental disclosure–including the personal case notes, associated photographs, and ATF evidence transmittal form sent to Wright on April 14, 2023–revealed the specific pieces of physical evidence Shelley examined, clarified that he relied on reports from other investigators that were already in Wright's possession, disclosed his use of the ACE-V method, and stated that he formed his opinion "based on the totality of his examination, his education, training, and experience." Doc. 213 at 3-4.  Wright's first argument, therefore, fails.

Wright is correct, however, that Rule 16(a)(1)(G)(v) requires experts to sign disclosures unless the Government "states in the disclosure why it could not obtain the witness's signature through reasonable efforts" or

"has previously provided under (F) a report, signed by the witness, that contains all the opinions and the bases and reasons for them required by (iii)." *See* doc. 217 at 7. The Government does not contend that it could not obtain Shelley's signature through reasonable efforts, *see generally* doc. 213, and as the Court noted above, Shelley's original report does not contain any bases or reasons for his opinion, *see generally* doc. 205-1. The Government's supplemental disclosure is therefore insufficient under Rule 16.

In determining appropriate sanctions for a violation of Rule 16, courts must consider: (1) the reasons for the government's violation; (2) the extent of the prejudice, if any, the defendant has suffered because of the violation; (3) the feasibility of curing such prejudice with sanctions; and (4) whether the prosecution acted in bad faith. *See Fernandez*, 780 F.2d at 1576; *Turner*, 871 F.2d at 1580. Furthermore, courts "should impose the least severe sanction that will accomplish the desired result– prompt and full compliance with" the governing discovery rules. *Sarcinelli*, 667 F.2d at 7.

While the Government offers no explanation for its failure to obtain Shelley's signature, *see generally* 213, Wright does not contend that he

was prejudiced by the omission, nor does he explain how striking the supplement will cure any unnamed prejudice against him, *see* 217 at 7. The Government's insufficient disclosure demonstrates a lack of care rather than ill will.  Striking the supplement altogether because of the Government's technical noncompliance with Rule 16 is too severe a sanction under the circumstances alleged here.

Nevertheless, without Shelley's signature, the supplemental disclosure falls short of Rule 16's requirements.  Fed. R. Civ. P. 16(a)(1)(G)(v).  Without the supplemental disclosure, the initial expert disclosure for Shelley is also inadequate under Rule 16.  As with Hoover, the Court **DIRECTS** the Government to submit a renewed expert disclosure for Shelley that complies with all of Rule 16's requirements within 14 days of the issuance of this Order.  *See* Fed. R. Crim. P. 16(d)(2)(A).  If the Government's renewed disclosure fails to satisfy Rule 16, Wright may challenge the disclosure and move for appropriate sanctions–based on the Eleventh Circuit's framework for evaluating Rule 16(d) sanctions–within 7 days of the renewed disclosure's filing.  The Government will have 7 days to respond to any motion for sanctions. Given these instructions, Wright's motion to strike the supplemental

disclosure, doc. 217, is **DISMISSED as moot**.  The Government's motion to supplement its disclosure, doc. 213, is also **DISMISSED as moot**.

        b. _Daubert_ Challenge

Wright also challenges Shelley's qualifications, the reliability of his methodology, and the helpfulness of his opinion.  _See_ doc. 205.  At least, the Court interprets his motion as such.  The challenge to Shelley's qualifications and reliability is not entirely clear.  Indeed, that portion of Wright's motion includes no argument or law.  _Id._ at 1-3.  Wright appears to object to: (1) Shelley's reliance on other ATF agents' reports; (2) Shelley's failure to conduct testing himself; (3) Shelley's failure to identify what specific pieces of physical evidence were reviewed and how they lead him to his opinion; (4) Shelley's failure to identify what methodology he used to examine the evidence and form an opinion; and (5) Shelley's lack of academic credentials and "limited" formal training. _Id._

The Court construes the objection to Shelley's lack of academic credentials and "limited" formal training as a challenge to his qualifications.  The Government's supplemental disclosures, technically deficient though they may be, informed Wright that Shelley used the

ACE-V method in conducting his examination.  Additionally, a list of the specific pieces of physical evidence Shelley examined were transmitted to Wright on April 14, 2023.  *See* doc. 213 at 2-4.  Wright's third and fourth arguments are therefore moot.  The Court construes the remaining objections—his reliance on other reports, the lack of testing, and the absence of a detailed explanation as to how the physical evidence informed his opinion—as a general challenge to the reliability of Shelley's methodology.

First, as to Shelley's qualifications, experts can be qualified based on "knowledge, skill, experience, training, *or* education."  Fed. R. Evid. 702 (emphasis added).  Though he calls Shelley's training "limited," Wright acknowledges that Shelley has taken "varied seminars and short courses" pertaining to explosive devices "totaling approximately 450 class hours over a period of 15 or more years while enlisted in the Army or employed by ATF."  Doc. 205 at 2; *see also* doc. 205-2.  By the Court's calculation, the total number of hours of training Shelley has received regarding explosives is closer to 2,000 hours over 28 years.[8]  *See* doc. 205-

---

[8]  The 1995 Explosive Ordnance Disposal School alone lasted 1,200 hours.  Doc. 205-2 at 8.

2 at 5-8. Shelley also testified that he specifically received training on the meaning of federal firearms statutes for the purpose of identifying whether a potential destructive device meets the statutory definition. Shelley's training qualifies him to offer this opinion.

Second, Wright appears to question the reliability of Shelley's opinion. In determining reliability, the Court must consider the four factors outlined in *Daubert*: whether a technique can be (and has been) tested; whether a technique has been peer reviewed; any known or potential rates of error; and whether a technique is generally acted in the field. *See Daubert*, 509 U.S. at 593-94. "[T]hese factors are not exhaustive and are intended to be applied in a 'flexible' manner." *United Fire and Cas. Co.*, 704 F.3d at 1341 (11th Cir. 2013) (citing *Kumho Tire Co., Ltd.*, 526 U.S. at 141).

Shelley used the ACE-V method to examine the evidence and develop his opinion. Doc. 213 at 9. ACE-V stands for analyze, evaluate, compare, and verify. *Id.* The Eleventh Circuit considers ACE-V a reliable methodology in the field of fingerprinting. *See United States v. Scott*, 403 App'x 392, 397-98 (11th Cir. 2010); *United States v. Hood*, 846 F. App'x 828-29 (11th Cir. 2021). The Court concludes from these cases

40

that there is nothing inherently defective about the process in and of itself. At the *Daubert* hearing, Shelley testified that ACE-V is generally accepted by the International Society of Explosives Engineers. Shelley also testified that his conclusions were reviewed by peers and by a final examiner, a supervising branch chief who "actually reexamines everything again" and signs the final report. *See* 205-1 at 3. In light of ACE-V's acceptance in the relevant scientific community and the extensive internal review process Shelley's findings underwent, the Court finds Shelley's methodology reliable. *See United States v. Zajac*, 2010 WL 3546782, at *2-4 (D. Utah Sept. 9, 2010) (finding a "comparative analysis model [that] loosely follows the ACE-V methodology" reliable when an ATF explosives officer testified that the method was widely accepted in the forensic explosives community and the report underwent multiple rounds of review).

Third, Wright argues that Shelley's opinion as to the statutory classification of the device is unhelpful for two reasons. Doc. 205 at 3-5. First, he argues the opinion tells the jury what conclusion to reach. *Id.* at 3-4. *See Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990) (noting that "merely telling the jury what result to reach

is not helpful to the jury and therefore is not admissible testimony"). Second, he argues the opinion is a legal conclusion. *Id.* at 4-5. *See Frazier*, 387 F.3d at 1262-63 (11th Cir. 2004) ("Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments."). The Court addresses the second argument first.

Experts are prohibited from "testify[ing] to the legal implications of conduct; the court must be the jury's only source of law." *Montgomery*, 898 F.2d at 1541. But "[t]he line between proper expert testimony (facts, inferences to draw therefrom, and the expert's opinion) and improper expert testimony (the actual requirements of the law) is often difficult to draw." *Cooper v. Pacific Life Ins. Co.*, 2007 WL 430730, at *1 (S.D. Ga. Feb. 6, 2007); *see also Hanson v. Waller*, 888 F.2d 806, 811 (11th Cir. 1989) ("[T]he distinction between whether challenged testimony is either an admissible factual opinion or an inadmissible legal conclusion is not always easy to perceive.").

That is the case here. On the one hand, if Shelley testifies that "[i]ncendiary bombs are destructive devices as that term is defined in 26 U.S.C., section 5845(f) and would be regulated in accordance with the

Federal Firearms Regulations," doc. 205-1 at 3, he would effectively be defining the law for the jury. This is contrary to the requirement that "the court must be the jury's only source of law." *Montgomery*, 898 F.2d at 1541. On the other hand, courts sometimes treat the question of a device's proper classification under federal law as a question of fact rather than a question of law. *See e.g., United States v. Buchanan*, 787 F.2d 477, 483-84 (10th Cir. 1986) ("Whether the nature of a particular device is such that it must be registered is an ultimate fact question."). The Eleventh Circuit has not directly addressed whether an explosives expert may cite to 26 U.S.C. § 5845(f) when opining as to the classification of an explosive device, though it did not explicitly object to an ATF explosives enforcement officer offering an expert opinion that a defendant's "pipe bombs were 'destructive devices' *under federal law*" in *United States v. Spoerke*, 568 F.3d 1236, 1243 (11th Cir. 2009) (emphasis added).

Because there is not clear precedent on this issue, the Court, mindful of its role as a gatekeeper, adopts the approach taken by the District of Utah in *United States v. Zajac*. There, the court prohibited an explosives expert from testifying "that '[e]xplosive bombs are destructive

devices as that term is defined in [26 U.S.C. § 5845(f)]'" because such testimony "constitutes an instruction to the jury that an explosive bomb meets the legal definition of a destructive device." 2010 WL 3546782, at *6. The expert was allowed to testify, however, that in his opinion the device was a destructive device. *Id.* In other words, the expert could not inform the jury as to the contents of 26 U.S.C. § 5845(f) but could nevertheless offer opinions that corresponded with the statute's language.

Shelley may not testify that "[i]ncendiary bombs are destructive devices as that term is defined in 26 U.S.C., section 5845(f)," but he may opine that the device was designed as an incendiary weapon, that the device was an improvised incendiary bomb, and that the device was a destructive device. *See* doc. 205-1 at 3. He may also define those terms– "incendiary weapon," "improvised incendiary bomb," and "destructive device"–as he understands and uses them as an explosives expert and ATF officer. Because Shelley testified at the *Daubert* hearing that ATF officers are trained to use the Federal Firearms Regulations in their investigations to determine whether a device falls within the statute, the Court anticipates that he may offer the statutory definitions as his own.

So long as Shelley does not testify that the definitions he offers are the statutory definitions, his testimony will not "constitute[] an instruction to the jury that [a specific term] meets the legal definition" of that term as defined in 26 U.S.C. § 5845(f).  *See Zajac*, 2010 WL 3546782, at *6. For example, Shelley may testify that he, as an explosives expert and ATF officer, would classify an incendiary bomb as a destructive device, but he may not testify that 26 U.S.C. § 5845(f) defines an incendiary bomb as a destructive device.

As to whether the limited opinion Shelley may offer tells the jury what conclusion to reach, the Court finds that it does not.  Though the testimony may touch on the ultimate issue, "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 702(a).  The jury will still decide "whether the statutory elements of the charged offenses have been met." *See* doc. 205 at 3.  Shelley's anticipated testimony regarding the function and appropriate classification of the device–without reference to the statute–will assist the jury in making that determination because such "matters are beyond the understanding of the average lay person." *Frazier*, 387 F.3d at 1262.  Therefore, his testimony is helpful.

Wright's Motion to Exclude Expert Testimony by ATF Officer Stephen Shelley, doc. 205, should be **GRANTED IN PART** and **DENIED IN PART**. Shelley should be prohibited from explicitly invoking or testifying as to the contents of 26 U.S.C. § 5845(f), but he should be permitted to opine that the device was designed as an incendiary weapon, that the device was an improvised incendiary bomb, and that the device was a destructive device. *See* doc. 205-1 at 3. He should also be permitted to define those terms as he understands them as an ATF officer and explosives expert, so long as he does not testify as to how his definitions compare to the statute.

### D. Gregg Mokrzycki

Wright seeks to exclude the expert testimony of Gregg Mokrzycki, a forensic document examiner with the FBI. *See* doc. 234. At trial, Mokrzycki is expected to explain the FBI's Matchmaker Shredded Paper Reconstruction System ("Matchmaker")[9]— ███████████████████████████████████████

---

[9] The FBI uses Matchmaker "in a very significant way for sensitive cases, including terrorism or intelligence related cases." Doc. 244 at 3. ███████████████ ████████████████████████████████████████████████████████ ████████████████████████████ Mokrzycki's presentation, Gov. Ex. 18, was admitted under seal, with the understanding that the sealing included complete access to all counsel and retained experts in this case. *See generally* doc. 287 (Minute Entry). In light of the

██████████████████████████████████████████████████████

████████████████████████████████████████████–and testify

that, in his opinion, "the shredded paper seized in this case were digitally reconstructed as best as possible from the scanned images of the submitted shredded paper." Doc. 244 at 4. At the *Daubert* hearing, Mokrzycki clarified that he also offers the reconstructed images themselves as his opinion. Doc. 305 at 38. Wright argues that Mokrzycki should be excluded because the expert disclosure was insufficient under Rule 16 and his expected expert testimony is inadmissible under *Daubert*. *See generally* doc. 234. At the heart of Wright's *Daubert* challenge is the issue of reliability. *See id.* at 6-7; doc. 249 at 3-4.

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████  ████  ████████████████████████████████████████

████  ██████████████████████████████████████████████████

---

potential national security concerns involved, the Court will file a redacted version of this Order on the public docket, with details about Matchmaker and references to the Government's sealed exhibit redacted. The Clerk is **DIRECTED** to maintain the unredacted version of this Order **UNDER SEAL** in accordance with his policies and procedures. The Clerk is further **DIRECTED** to provide an unredacted copy to the Government and counsel for Wright.



Because Mokrzycki offers the images produced by Matchmaker as part of his opinion, the Court must evaluate the reliability of both the Matchmaker reconstruction process and the process Mokrzycki used to review the images and conclude that they had been pieced together "as

best as possible." Doc. 244 at 4; *see also Daubert*, 509 U.S. at 592-93 (holding that courts must assess "whether the reasoning or methodology underlying the testimony is scientifically valid"). To evaluate the reliability of an expert's opinion, courts should consider whether the technique used to reach an opinion: (1) can be and has been tested; (2) has been subjected to peer review and publication; (3) has a known potential error rate; (4) is subject to existing standards controlled by a professional organization or equivalent body; and (5) is generally accepted by the relevant scientific community. *See Daubert*, 509 U.S. at 593-94. The Court will address these factors, when applicable, for both the Matchmaker reconstruction process and Mokrzycki's review process. *See Kumho Tire Co., Ltd.*, 526 U.S. at 151 (noting that the *Daubert* factors "do not all necessarily apply even in every instance in which the reliability of scientific testimony is challenged").



















███████████████████████████████████████

████████████████████

The party offering the expert opinion bears "the 'substantial burden' of laying the proper foundation for the admission of" its expert's testimony. *Hicks v. Middleton*, 2022 WL 17491799, at *6 (S.D. Ga. July 18, 2022) (quoting *Cook ex rel. Estate of Tessier v. Sherriff of Monroe Cnty. Fla.*, 402 F.3d 1092, 1107 (11th Cir. 2005)). The Government fails to meet this burden. ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████ ███ ███████████████ ██████████ ████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████   The Government fails to establish that the Matchmaker reconstruction process and Mokrzycki's review process are reliable under *Daubert*.  Accordingly, Wright's Motion to Exclude Expert Testimony of Gregg M. Mokrzycki should be **GRANTED**.[11]  Doc. 234.

### E. Frederic Whitehurst

The Government seeks to exclude expert testimony from Frederic Whitehurst, a former FBI Supervisory Special Agent and current forensic consultant, who has "experience in investigating and reconstructing improvised explosive devices."  *See* doc. 268; doc. 268-1 at 3.  Whitehurst is expected to testify that "[n]o specialized tools or skills would be needed to construct the device in this case," doc. 273 at 4, and the "cables and connectors found by investigators in this case were no more likely to have been manufactured by Hopkins than by any one of a number of other makers," doc. 268-1 at 4.

---

[11]  Because Mokrzycki's expert testimony should be found inadmissible under the reliability prong of *Daubert*, the Court need not reach Wright's Rule 16, qualifications, or helpfulness arguments.  *See generally* doc. 234.  The Government's motion to supplement its expert disclosure for Mokrzycki in response to Wright's Rule 16 arguments, doc. 244, is therefore **DISMISSED as moot**.

The Government argues that Whitehurst's expert testimony is inadmissible under *Daubert* for two reasons.  First, the Government argues that "Whitehurst is a chemist" and his "experience as forensic chemist with the FBI does not qualify him to testify about electrical devi[c]es, electrical systems, electrical components, or destructive devices."  Doc. 268 at 3.  Second, the United States argues that because Whitehurst is not qualified to testify as to those matters, his testimony "would not assist the trier of fact and would confuse the jury."  *Id.* Because the Government's second argument conflates arguments about qualifications and helpfulness, *see Frazier*, 387 F.3d at 1260 (holding that "qualification [and] reliability . . . remain distinct concepts and the courts must take care not to conflate them"), the Court only addresses the Government's challenge to Whitehurst's qualifications.

The Government focuses its *Daubert* motion on the apparent disconnect between Whitehurst's Ph.D. in chemistry and time as a "forensic chemist" with the FBI and the opinion he intends to offer about the construction of the destructive device at issue in this case, which is "silent on any issues of chemistry."  Doc. 268 at 3.  But as Wright correctly points out in his response, experts can be qualified based on "knowledge,

skill, experience, training, *or* education."  Fed. R. Evid. 702 (emphasis added); *see also* doc. 273 at 2.  Wright offers Whitehurst not as a chemist, but for his experience working with improvised explosive devices.  *See generally* doc. 273.  Wright supplemented Whitehurst's initial disclosure and report to explain that while working for the FBI Laboratory and afterwards as a forensic consultant, Whitehurst "examined many and various improvised destructive devices," including those "which employed switches and timers controlled in various ways."  *Id.* at 3.

Whitehurst investigated matters "[i]nvolving [e]xplosives" with the FBI Laboratory from 1986 to 1998.  Doc. 268-2 at 3.  At the *Daubert* hearing, he estimated that during that time, he worked on roughly 960 cases involving improvised explosive devices.  He testified that he performed hands-on examinations of the devices and, on occasion, oversaw the construction of improved explosive devices "in order to understand the residue patterns."  He made hundreds of pipe bombs for this purpose.  In more recent years, the United States government has hired Whitehurst as a consultant to reconstruct improvised explosive devices.  As an example, he was tasked with reconstructing the devices from the Boston Marathon bombing.  *See* doc. 268-1 at 3.

Whitehurst has significant experience with improvised explosive devices which could qualify him as an expert on that topic. However, when an expert "'witness is relying . . . primarily on experience, . . . the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" *Frazier*, 387 F.3d at 1261. Whitehurst has not sufficiently explained how his experience provides a sufficient basis to opine as to the construction of the *specific* destructive device at issue in this case. The Government's experts are expected to testify that the device in this case was constructed using a circuit board with a SIM card and could have been triggered "by an incoming call or SMS message to the cell phone number associated with the inserted SIM card." Doc. 235-1 at 5 (Report of Juan Rosado-Marin). Whitehurst does not dispute that conclusion; rather, he assumes the Government's experts' opinions as true and uses them a basis for forming his own opinion. *See generally* doc. 268-1 (Report of Frederic Whitehurst). But Whitehurst has not demonstrated how his experience with improvised explosive devices generally–and particularly, it seems, with pipe bombs–provides a sufficient basis to form an opinion on the

62

construction of a device made with a circuit board and inserted SIM card that was activated by cellphone call or text message.

Only about 10% of the devices Whitehurst "looked at" while with the FBI were "remote control devices." Initially, Whitehurst testified that "some" of those devices "use[d] cellphones or parts of cellphones in order to remotely switch the device on and off," but when asked on cross-examination if he recalled examining any cellphone-enabled devices during his time with the FBI, he said he did not "remember actually seeing a device that had a cellphone initiated" detonation. He also did not remember seeing any destructive devices that used a SIM card as a component. Whitehurst admitted that he had never seen the "particular electronic" used in the device at issue before being retained for this case. While some of the devices he examined during his time with the FBI were triggered remotely via "beeper" or "pager," Whitehurst did not explain how experience with devices constructed with that outdated technology translated to a device constructed with different, more modern technology. He also did not testify as to any experience identifying or distinguishing cables or wires related to his experience with improvised explosive devices.

For the foregoing reasons, the Court concludes that while Whitehurst may have significant experience with improvised explosive devices, he has not explained how that experience provides a sufficient basis for him to opine as to the construction of the device at issue. As such, he is not qualified to opine that "[n]o specialized tools or skills would be needed to construct the device in this case," doc. 273 at 4, and the "cables and connectors found by investigators in this case were no more likely to have been manufactured by Hopkins than by any one of a number of other makers," doc. 268-1 at 4. *See Frazier*, 387 F.3d at 1261 (requiring experts relying on their experience to "explain why that experience is a sufficient basis for the opinion"). The Government's Motion to Exclude Defense Expert Testimony of Frederick Whitehurst should be **GRANTED**. Doc. 268.

## III.   CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that Wright's motions to exclude expert testimony from Lee Hoover, doc. 220, and Juan-Rosado Marin, doc. 235, be **DENIED**. Wright's motion to exclude expert testimony from Stephen Shelley should be **GRANTED IN PART** and **DENIED IN PART**. Doc. 205. Wright's motion to exclude

expert testimony from Gregg Mokrzycki should be **GRANTED**.  Doc. 234. The Government's motion to exclude expert testimony from Frederic Whitehurst should be **GRANTED**.  Doc. 268.[12]

Furthermore, the Government is **DIRECTED** to file renewed expert disclosures as to Lee Hoover and Stephen Shelley within 14 days of the issuance of this Order.  If the Government's renewed disclosures fail to satisfy Rule 16, Wright may move for appropriate sanctions within 7 days of the date the renewed disclosures are filed.  The Government will have 7 days to respond to any motions for sanctions.

This report and recommendation (R&R) is submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 72.3.  Within 14 days of service, any party may file written objections to this R&R with the Court and serve a copy on all parties.  The document should be captioned "Objections to Magistrate Judge's Report and Recommendations."  Any request for additional time to file objections should be filed with the Clerk for consideration by the assigned district judge.

---

[12]  Wright's superseded motion to exclude expert testimony from Lee Hoover, doc. 207, the Government's motions to supplement their expert disclosures, docs. 213 & 244, and Wright's motion to strike, doc. 217, are **DISMISSED as moot**.

After the objections period has ended, the Clerk shall submit this R&R together with any objections to the assigned district judge. The district judge will review the magistrate judge's findings and recommendation pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to timely file objections will result in the waiver of rights on appeal. 11th Cir. R. 3-1; *see Symonette v. V.A. Leasing Corp.*, 648 F. App'x 787, 790 (11th Cir. 2016); *Mitchell v. United States*, 612 F. App'x 542, 545 (11th Cir. 2015).

**SO ORDERED AND REPORTED AND RECOMMENDED**, this 8th day of March, 2024.

CHRISTOPHER L. RAY
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA